IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

RECEIVED

| | | |
|---|---|---|
| Frances Rogers | : | |
| Plaintiff, | : | DEC 2 8 2012 |
| | : | AT 8:30 |
| v. | : | WILLIAM T. WALSH ——M |
| | : | CLERK |
| | : | Verified Complaint |
| Brad A. Morrice, | : | |
| GOLDMAN SACHS GROUP, INC., | : | Civil Action._____ |
| GOLDMAN, SACHS & CO., INC., | : | |
| GS MORTGAGE SECURITIES CORP., | : | |
| GOLDMAN SACHS MORTGAGE COMPANY, | : | |
| GSAMP TRUST 2007 – NC1 | : | |
| WELLS FARGO & COMPANY and WELLS | : | |
| FARGO BANK, N.A., | : | |
| DEUTSCHE BANK and DEUTSCHE BANK | : | |
| NATIONAL TRUST COMPANY, | : | |
| LITTON LOAN SERVICING LP, | : | |
| MERSCORP HOLDING INC., and MORTGAGE | : | |
| ELECTRONIC REGISTRATION SYSTEM, INC., | : | |
| PHELAN HALLINAN & SCHMIEG, PC, | : | |
| PHELAN HALLINAN & SCHMIEG, LLP, | : | |
| Lawrence Phelan, Francis Hallinan, Daniel Schmieg, | : | |
| Rosemarie Diamond, Judith T. Romano, Brian Yoder, | : | |
| Brian Blake, Thomas M. Brodowski, Vladimir Palma, | : | |
| and Sharon L. McMahon, | : | |
| BANK OF AMERICA CORPORATION and BANK | : | |
| OF AMERICA, N.A., | : | |
| OCWEN FINANCIAL CORPORATION, | : | |
| OCWEN LOAN SERVICING LLC, | : | |
| Defendants, | : | |

## TABLE OF CONTENTS

I. SUMMARY OF ALLEGATIONS...............................................................3-5

II. JURISDICTION AND VENUE...............................................................6

III. PARTIES

       Frances Rogers, surviving spouse of Thomas Rogers...................................6

       Defendants........................................................................7-10

IV. BACKGROUND:  Mortgage Meltdown of 2008:  *Trails of an Arson*"...................10-36

V. FACTUAL ALLEGATIONS

  A.    November 28, 2006 – Present: *"The Rogers Family"*...........................37-69

  B.    New Century Mortgage:  *"Close More University"*..............................69-87

  C.    GSAMP Trust 2007 – NC1 *"Asset(less)Backed Security"* ............................88-137

  D.    Robo-Signing in Motion...........................................................137-163

  E.    Ocwen Financial Corporation: *"Creating Numbers Out of Thin Air"*.........164-172

VI. CLAIMS FOR RELIEF

    i.      COUNT ONE: FEDERAL RICO....................................................173-187
    ii.     COUNT TWO: FRAUDULENT CONCEALMENT..............................187-192
    iii.    COUNT THREE:  AIDING AND ABETTING...................................192-196
    iv.    COUNT FOUR:  N.J.S.A. 2C:41-1; New Jersey Rico...........................196-200
    v.     COUNT SIX: N.J.S.A. 62A-27c, N.J.S.A. 2A:15-5.10;
         Gross Negligence.......................................................................200-203
    vi.    COUNT FIVE: N.J.S.2C:11-4; Reckless Manslaughter.............................204-205
    vii.   COUNT SEVEN: NJCFA.........................................................205-207
    viii.  COUNT EIGHT: NJ2C:20-3; Theft..............................................207-208
    ix.    COUNT NINE:  COMMON LAW FRAUD.........................................208
    x.     COUNT TEN:  COMMON LAW NEGLIGENCE.............................208-210

VII.  JURY TRIAL DEMAND...................................................................211

VIII. PRAYER FOR RELIEF...................................................................211-217

     A.  Request for Investigation by U.S. Authorities.............................215-216

IX. EXHIBITS..................................................................................218-414

# I.  SUMMARY OF ALLEGATIONS

1. The issues pertaining to this pro se complaint made by Frances Rogers are the calculated, nefarious, fraudulent, and negligent actions of the named Defendants, acting in collusion, as it pertains to the November 28, 2006 ARM refinance on the New Jersey residential property owned by the complainant and her late spouse, Thomas Rogers, both of whom are elderly minorities living in a predominately African American community that was one of many U.S. neighborhoods targeted by predatory lenders, backed by their financiers, for subprime loans with questionable appraisals, followed by the pooling, securitization (lack thereof), servicing, and deliberate scheme to fraudulently foreclose on the couple's New Jersey residential property starting in August 2008, contributing to the death[1] of Thomas Rogers in June 2009, and the complainant's ongoing emotional, mental, physical, and financial distress yet to be rectified.

2. An analysis of …

    a) 2008's financial crisis underlined by subprime mortgages originated by the defunct New Century Mortgage[2] and other troubled lenders including Fremont and Countrywide[3], (1) loans originated from "warehouse" lines of credit from top Wall Street firms including Goldman Sachs Group, Inc. and Deutsche Bank AG, (2) who pooled and (supposedly) securitized materially defective

---

[1] See http://www.huffingtonpost.com/2012/07/06/harry-engel-death-jpmorgan-chase_n_1651715.html for Texas lawsuit from 2012 where an elderly male died while fighting a foreclosure pursuit by their servicer JP Morgan Chase.  In addition, see http://www.umm.edu/news/releases/health-crisis-and-home-foreclosures.htm for the University of Maryland's scientific study, and http://www.nytimes.com/2011/10/03/opinion/foreclosures-are-killing-us.html, of the adverse effect of foreclosures on the health of homeowners,  http://www.mesothel.com/asbestos-cancer/mesothelioma/patient-care/stress.htm and http://www.plosone.org/article/info%3Adoi%2F10.1371%2Fjournal.pone.0042324 for scientific studies on the adverse of stress on cancer patients.

[2] See http://www.sec.gov/litigation/complaints/2009/comp21327.pdf for *Securities and Exchange Commission v. Brad A. Morrice et al., Civil Action No. CV 09-01426 DDP (C.D. Cal.)*, settled in July 2010.

[3] Countrywide was purchased by Bank of America is the subject of numerous lawsuits across the USA, most notably, a lawsuit highlighting a loan origination program called "Hustle" by the Bank of America company.  See http://www.justice.gov/usao/nys/pressreleases/October12/BankofAmericanSuit/BofA%20Complaint.pdf for October 2012's, $1 Billion lawsuit *U.S. v. Bank of America / Countrywide, et al.,*

mortgages into Residential Mortgage Backed Securities (RMBS) and
Collateralized Debt Obligations (CDOs), (3) designated AAA by the leading
rating agencies, (4) then sold by the Wall Street firms to pension funds[4],
insurance companies[5], and other investors worldwide without disclosing the
material defects within the loans or the firms short positions and  Credit
Default Swaps (CDS) referencing the same assets, (5) followed by record
foreclosures across the United States of America underlined by "robo-
signing"[6], (6) resulting in billions lost by investors including pension funds[7]
and insurance companies,[8](7) millions of homes lost by US Citizens, (8)
billions in profits gained by the Wall Street firms including Goldman Sachs
from their short positions, CDS contracts, payouts from 2008's $700 Billion in
TARP Funds[9], and trillions in Federal Reserve Emergency Funds[10]...;

b)  the complainant's factual testimony of events between herself and the named
Defendants beginning on November 28, 2006 with the Rogers' refinancing into
the final of three  subprime adjustable rate mortgages in a span of four years

---

[4] See http://sdnyblog.com/wp-content/uploads/2012/06/09cv01110-Order.pdf for *Public Employees Retirement System of Mississippi v. Goldman Sachs Group Inc., 09-cv-01110, U.S. District Court, Southern District of New York Manhattan*, settled in July 2012.

[5] See http://reaction.orrick.com/rs/emsdocuments/FinancialIndustryWeekInReview/17September2012/C.pdf for Prudential v. Goldman, New Jersey lawsuit from 2012.

[6] See https://d9klfgibkcquc.cloudfront.net/Complaint_Corrected_2012-03-14.pdf for February 2012's, $25 Billion National Mortgage Settlement http://nationalmortgagesettlement.com/.

[7] See http://sdnyblog.com/wp-content/uploads/2012/06/09cv01110-Order.pdf for *Public Employees Retirement System of Mississippi v. Goldman Sachs Group Inc., 09-cv-01110, U.S. District Court, Southern District of New York Manhattan*, settled in July 2012.

[8] See http://reaction.orrick.com/rs/emsdocuments/FinancialIndustryWeekInReview/17September2012/C.pdf for Prudential v. Goldman

[9] See http://projects.propublica.org/bailout/list for list of TARP fund recipients.

[10] See http://www.bloomberg.com/data-visualization/federal-reserve-emergency-lending/#/overview/?sort=nomPeakValue&group=none&view=peak&position=0&comparelist=&search= for the trillions in Federal Reserve Emergency Funds given to financial firms, including Defendants Goldman Sachs , Wells Fargo, Deutsche Bank, and Bank of America  in the wake of the financial crisis of 2008

4

with the last origination from the defunct New Century Mortgage, the violations that ensued thereafter, into the present day…;

c) and a timeline of subpoenas, sanctions, lawsuits settled and pending against the named Defendants as it pertains to their fraudulent undertakings of loan originations, the pooling and securitization of RMBS and collateralized debt obligations (often not backed by loans although declared so within the prospectus), the selling of the securities while simultaneously shorting the assets, unwarranted foreclosures, TARP relief generating billions of dollars, and Federal Reserve Emergency Funds generating trillions to the Defendants…

validates the complainant's allegations of an orchestrated and deliberate racketeering mortgage related scheme to illegally foreclose on the complainant and other U.S. homeowners invoking fraud, extortion, theft, aiding and abetting, fraudulent concealment, and gross negligence, to which Thomas Rogers' life was lost, and the complainant's suffering continues with relief yet to come.

3. Hence, the timeline of subpoenas, sanctions, lawsuits, and settlements by the named Defendants consist of documents disseminated by, among other government authorities, the United States Department of Justice, the Federal Trade Commission, the Federal Reserve System, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the United States Department of Housing and Urban Development, the Federal Housing Finance Agency, the Consumer Financial Protection Bureau; members of the National Association of Attorneys General, and the New Jersey Administrative Office of the Courts, federal and state court filings and other public records, review and analysis of legal journals, Congressional testimony, and Securities and Exchange Commission (SEC) filings, all of whom acknowledge the Defendants negligence as it pertains to the financial crisis triggered by the mortgage crisis of 2008 and following events.

5

## II.   JURISDICTION AND VENUE

4.  Federal question jurisdiction is conferred upon this Court by 18 U.S.C. § 1964(c); 15
    U.S.C. § 1692k(d);, S. Const. Article III § 2;, 18 U.S.C. 3231;, 28 U.S.C. 1331, 28 U.S.C.
    1332, 28 USC § 1350, 28 U.S.C. § 1361, 28 U.S.C. 1343; and 31 U.S.C. 3729.  The
    Court may adjudicate the complainant's common law claims under principles of pendant
    jurisdiction.  This Court has in personam jurisdiction over Defendants, inter alia, because
    Defendants live in, maintain offices, have employees and agents, and regularly transact
    business within this District. Venue is proper in this District because many of the events
    giving rise to the complainant's claims occurred in this District.

## III.   PARTIES

### Plaintiff

5.  This complaint is made by Frances Rogers (the complainant), surviving spouse of
    Thomas Rogers, against the named Defendants for her continued emotional, mental,
    physical, and financial distress and death of Thomas Rogers resulting from the
    Defendant's collusion and operation of a perpetual, global mortgage related scheme
    underlined in racketeering, fraud, extortion, theft, and negligence in violation of the
    Racketeer Influenced and Corruption Act ("RICO"); 18 U.S.C. §1962(c), Fraudulent
    Concealment, Aiding and Abetting, N.J.S.A. 2C:41-1; New Jersey Rico, N.J.S.A. 2C:41-
    1; Reckless Manslaughter, N.J.S.2C:11-4; N.J.S.A. 62A-27c; Gross Negligence, N.J.S.A.
    2A:15-5.10; the New Jersey Consumer Fraud Act ("NJCFA"),  and N.J.S.A. § 56.8-1et
    seq.; Theft, NJ2C:20-3.   Frances Rogers is the owner of the residential property in
    Willingboro, Burlington County, New Jersey pertinent to this complaint and currently
    resides in Killeen, Texas.

**Defendants**

6.  Defendant Brad A. Morrice in his official capacity as CEO and co-founder of the defunct New Century Financial Corporation, a corporation chartered in California, deemed the 2nd largest subprime lender in 2007,[11] the same year they became insolvent.[12]

7.  Defendant Goldman Sachs Group Inc., and its subsidiaries Goldman, Sachs & Co., Inc., Goldman Sachs Mortgage Company, GS Mortgage Securities Inc., GSAMP Trust 2007 – NC1, and Litton Loan Servicing LP (Dec. 2007 – Sept. 2011).  Goldman Sachs Group Inc. (Goldman Sachs and its subsidiaries named as Defendants are hereby referred to as Goldman) is an American multinational investment banking firm that engages in global investment banking, securities, investment management, and other financial services primarily with institutional clients. Parent company Goldman is headed by CEO Lloyd Craig Blankfein (May 2006 – Present) and President / COO Gary D. Cohn (June 2006 – Present).  The firm is headquartered at 200 West Street in the Lower Manhattan area of New York City, with additional offices in international financial centers.  Goldman was a provider of lines of credit to New Century Mortgage for loan originations made by the firm throughout the U.S.A.

8.  Defendant Wells Fargo & Company is parent company of Wells Fargo Bank, N.A.  Wells Fargo & Company is an American multinational diversified financial services company with operations around the world. Wells Fargo is the fourth largest bank in the U.S. by assets and the largest bank by market capitalization. Wells Fargo is the second largest bank in deposits, home mortgage servicing, and debit cards. In 2011, Wells Fargo was the 23rd largest company in the United States.  Wells Fargo Bank, N.A. originates and services residential mortgages through its division Wells Fargo Home Mortgage or its trade name America's Servicing Company.  John G. Stumpf is the Chairman, President, and CEO.  The firm is headquartered in San Francisco, California, but has major hub-quarters in other cities throughout the country.  Defendant Wells Fargo Bank, N.A. is a

---

[11] See http://usatoday30.usatoday.com/money/perfi/housing/2007-04-02-new-century-bankruptcy_N.htm?csp=34

[12] See http://www.boston.com/business/globe/articles/2007/04/03/big_subprime_lender_files_for_bankruptcy_aid/

national banking association chartered in Sioux Falls, South Dakota, with principal offices at 420 Montgomery Street, San Francisco, California 94163. They maintain principal places of business at 7000 Vista Dr., West Des Moines, Iowa 50266-93 and 3476 Stateview Boulevard, Fort Mill, South Carolina 29715.

9. Defendant Deutsche Bank AG, parent company of Deutsche Bank National Trust Company is a German global banking and financial services company with its headquarters in the Deutsche Bank Twin Towers in Frankfurt, Hesse, Germany, employing more than 100,000 people in over 70 countries, and has a large presence in Europe, the Americas, Asia-Pacific and the emerging markets. Deutsche Bank's Chief Executive Officer and Chairman of the Group Executive Committee is Josef Ackermann since May 2002. He agreed at the end of 2009 to continue as chief executive for another three years until 2013. On 26 July 2011, along with its second quarter earnings report, Deutsche Bank reported that Anshu Jain, head of investment banking and Juergen Fitschen, head of the German business, will replace Josef Ackermann as co-CEOs starting next year. Defendant Deutsche Bank National Trust Company is located at 1761 East St. Andrew Place, Santa Ana, California 92705-4934

10. Defendant MERSCORP Holdings, Inc. and its subsidiary, Mortgage Electronic Registration Systems, Inc. (hereby referred to as MERS) was founded in 1995 and is headquartered in Reston, Virginia. MERS is a creation of the mortgage industry to allow financial institutions to evade county recording fees, avoid the need to publicly record mortgage transfers, and facilitate the rapid sale and securitization (lack thereof) of mortgages en masse. More than 70 million mortgage loans[13], including millions of subprime loans, have been registered in the MERS system, rather than in local county clerks' offices. MERS is headed by Bill Beckmann in his official capacity as President and CEO of MERSCORP Holdings, Inc. and its subsidiary, Mortgage Electronic Registration Systems, Inc. Dan McLaughlin serves as Executive Vice President of MERSCORP Holdings, Inc.

---

[13]Seehttp://topics.nytimes.com/top/news/business/companies/mortgage_electronic_registration_systems_inc/index.html?inline=nyt-org for NY AG's estimation that MERS cost counties across America $2 billion in recording fees.

11. Defendant Phelan Hallinan & Schmieg, P.C., Phelan Hallinan & Schmieg, LLC (professional corporations under the laws of New Jersey, operating in Pennsylvania & New Jersey, hereby referred to as PHS), is a high-volume mortgage foreclosure law firm with Defendant Lawrence T. Phelan as its principal equity partner (49% and 41% respectively).   Other equity partners include Defendant Francis S. Hallinan, head administrator of the firm, and Defendant Daniel G. Schmieg.  The affiliate companies engaged in Phelan Hallinan & Schmieg's foreclosure mill are Land Title Services of New Jersey Inc. and Full Spectrum Services Inc.  The Defendants maintain a principal office at 400 Fellowship Road, Suite 100, Mount Laurel, New Jersey 08054, an office at One Gateway Center, 11th Floor, Newark, New Jersey 07102, and their Pennsylvania operations at 617 J.F.K. Boulevard, Suite 1400, Philadelphia, Pennsylvania 19103.

12. Defendants Judith T. Romano, Rosemarie Diamond, Brian Yoder, Brian Blake, Thomas M. Brodowski, Vladimir Palma, and Sharon L. McMahon, in their capacities as licensed attorneys employed by Phelan, Hallinan, & Schmieg, are involved in the everyday foreclosure related activities of the firm, and aided and abetted the alleged fraudulent foreclosure scheme in 2009 – 2010 affecting the complainant and the late Thomas Rogers.  The Defendants maintain a principal office at 400 Fellowship Road, Suite 100, Mount Laurel, New Jersey 08054, an office at One Gateway Center, 11th Floor, Newark, New Jersey 07102, and their Pennsylvania operations at 617 J.F.K. Boulevard, Suite 1400, Philadelphia, Pennsylvania 19103.

13. Defendant Bank of America Corporation is the parent company of Bank of America, N.A. (hereby referred to as BOA)  Bank of America is an American multinational banking and financial services corporation headquartered in 100 North Tryon Street Charlotte, North Carolina. It is the second-largest bank holding company in the United States by assets.  Charles O. Holliday is the acting chairman (April 2010 – Present) and Brian Moynihan is the CEO (2010 - Present).

14. Defendant Ocwen Financial Corporation is the parent company of several subsidiaries including Ocwen Loan Servicing, LLC and Litton Loan Servicing LP (Sept. 2011 – Present), licensed to service mortgage loans in all 50 states, the District of Columbia and

two U.S. territories.  The company is headquartered in Dunwoody, Georgia and also operates in West Palm Beach, Florida.  Ocwen Financial Corporation (Ocwen and its subsidiaries are hereby referred to as Ocwen) is headed by William C. Erbey (Exec. Chairman and Chairman of Exec. Committee), Ronald M. Faris (President, CEO and Director of Exec. Committee), John V. Britti (CFO and EVP), and Paul Koches (EVP, General Counsel and Secretary).

## IV.   BACKGROUND:

### Mortgage Meltdown of 2008 – *"Trails of an Arson"*

15. **Top Wall Street Trader "Smells Smoke."**  In 2006 and 2007, investment banks, including Goldman, created around half a trillion dollars in CDO securities each year, even as U.S. housing prices began to stagnate and decline, subprime mortgages began to default at record rates, and RMBS began to incur dramatic losses.  By the middle of 2007, due to the increasing risks, U.S. institutional investors like pension funds, hedge funds, and others began to purchase fewer CDO securities, and investment banks turned their attention increasingly to European and Asian investors as well as the issuers of new CDO's who became the primary buyers of CDO securities.  In 2007, U.S. investment banks kept issuing and selling CDO's (such as GSAMP Trust 2007 – NC1 to which the complainant's property was pooled in February 2007)[14], despite slowed sales, which meant that investment banks had to retain an increasing portion of the unsold assets on their own balance sheets.

16. In 2006 and 2007, Deutsche Bank's top CDO trader, Greg Lippmann, repeatedly warned his Deutsche Bank[15] colleagues and some clients outside of the bank about the poor quality of the assets underlying many RMBS and CDO securities.  Although senior

---

[14] See http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf for more information about the Pooling and Servicing Agreement of February 1, 2007 that created GSAMP TRUST 2007 – NC1

[15] Deutsche Bank's affiliate is the "Custodian" for GSAMP Trust 2007 – NC1 to which the complainants home was pooled in February 2007, see http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf

management within the bank did not agree with his views, they allowed Mr. Lippmann, in 2005, to establish a large short position on behalf of the bank, essentially betting that mortgage related securities would fall in value. Mr. Lippmann also developed a presentation supporting his position entitled, *"Shorting Home Equity Mezzanine Tranches."* It made the following points[16]:

- *"Over 50% of outstanding subprime mortgages are located in MSAs [metropolitan statistical areas] with double digit 5 year average of annual home price growth rates.*
- *There is a strong negative correlation between home price appreciation and loss severity.*
- *Default of subprime mortgages are also strongly negatively correlated with home price growth rates.*
- *Nearly $440 billion subprime mortgages will experience payment shocks in the next 3 years.*
- *Products that may be riskier than traditional home equity/subprime mortgages have become popular."*

17. Emails produced to the United States Senate Permanent Subcommittee on Investigations provide repeated examples of Mr. Lippmann's negative views of mortgage related assets, particularly those involving subprime mortgages.[17]  At times, he expressed his views to colleagues within the bank; at other times he expressed them in connection with advising

---

[16] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

[17] See http://www.pewhispanic.org/2009/05/12/through-boom-and-bust/ for the May 2009 report by the Pew Hispanic Center, detailing the erosion of homeownership gains made by African Americans and native born Latinos relative to whites as a result of the implosion of subprime mortgages that were pushed upon minorities by defunct lenders in greater numbers compared to whites.  Thus, Willingboro's residents are predominately non-white, 72% African American, the race of the Rogers.  See http://lwd.dol.state.nj.us/labor/lpa/census/2010/dp/dp1_bur/willingboro1.pdf for demographics for Willingboro, NJ per the 2010 Census.

a client to bet against an RMBS security by taking a short position.  At times, Mr. Lippmann recommended that his clients short poor quality RMBS assets, even while his trading desk was participating in a selection process that included those same assets created by Deutsche Bank.  The following emails by Mr. Lippmann, written during 2006 and 2007, provide examples of his negative views towards RMBS and CDO's sold and created by several firms, including Deutsche Bank (custodian of GSAMP Trust 2007 – NC1 to which the complainant's mortgage was pooled in February 2007)[18] for whom Mr. Lippmann worked and RMBS created by Goldman[19]…

- Email providing Deutsche Bank trader's opinion regarding RMBS shelves: *"[Y]ikes didn't see that[.] … [H]alf of these are crap and rest are ok[.] …[C]rap-heat pchlt sail tmts."* (4/5/2006)
- Email to co-head of the Deutsche Bank CDO Group and to Global Head of Deutsche Bank's Securitized Product Group: *"I was going to reject this [long purchase of a synthetic CDO] because it seems to be a pig cdo position dump 60^ but then I noticed winchester [Deutsche Bank affiliated hedge fund] is the portfolio selector……any idea???"* (8/4/2006)
- Email describing MSHEL 2006-1 B3, an RMBS security issued by Morgan Stanley as *"crap we shorted"*; referring to GSAMP 2006-HE3 M9, an RMBS security issued by Goldman Sachs, as *"this bond sucks but we are short 20MM"*; and noting with regard to ACE, which was created by and associated with Deutsche Bank, that *"ace is generally horrible."* (9/21/2006)

---

[18] See http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf for more information about the Pooling and Servicing Agreement of February 1, 2007 that created GSAMP TRUST 2007 – NC1

[19] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS:  Anatomy of a Financial Collapse"* of April 2011.

- Email regarding GSAMP 06-NC2 M8, an RMBS security that contained New Century loans and was issued by Goldman Sachs: *"[T]his is an absolute pig."*(12/8/2006)

18. When asked about these emails, Mr. Lippmann told the Subcommittee that he generally thought all assets in CDO's were weak, and that his descriptions were often a form of posturing while negotiating prices with his clients. In a number of cases, however, Mr. Lippmann was assisting his clients in devising short strategies or communicating with Deutsche Bank colleagues, rather than negotiating with clients over prices. Furthermore, some of the RMBS securities he criticized were, at virtually the same time, being included by his trading desk in Gemstone 7, which was later sold by Deutsche Bank's CDO Group. In addition to disparaging individual RMBS securities, Mr. Lippmann expressed repeated negative views about the CDO market as a whole and at times during 2006 and 2007, referred to CDO underwriting activity by investment banks as the workings of a *"CDO machine"* or *"Ponzi scheme."* In June 2006, for example, a year before CDO credit ratings began to be downgraded en masse, Mr. Lippmann sent an email to a hedge fund trader warning about the state of the CDO market: *"Stuff is flat b/c [because] the cdo machine has not slowed but I am fielding 2-4 new guys a day that are kicking the tires so we probably don't go tighter."*

19. A few months later, in August 2006, Mr. Lippmann wrote about the coming market crash: *"I don't care what some trained seal bull market research person says this stuff has a real chance of massively blowing up."* Mr. Lippmann also told the Subcommittee that while he knew that the major credit rating agencies had given AAA ratings to an unusually large number of RMBS and CDO securities and most people believed in the ratings, he did not. He also told the Subcommittee that he *"told his views to anyone who would listen"* but most CDO investors disagreed with him. In March 2007, Mr. Lippmann again expressed his view that mortgage related assets were *"blowing up"* stating in part… *"I remain firm in my belief that these are blowing up whether people like it or not and that hpa [housing price appreciation] is far less relevant than these bulls think. Can't blame them because if this blows up lots of people lose their jobs so*

*they must deny in hope that that will help prevent the collapse. At this price I'm nearly just as short as I've ever been."[20]*

20. Beginning in December 2006 and continuing through 2007, Goldman twice built and profited from large net short positions in mortgage related securities, generating billions of dollars in gross revenues for the Mortgage Department.   Its first net short peaked at about $10 billion in February 2007[21] (the same month Goldman created GSAMP Trust 2007 – NC1, consisting of 9,800 mortgages from New Century) and the Mortgage Department as a whole generated first quarter revenues of about $368 million, after deducting losses and write downs on subprime loan and warehouse inventory. The second net short, referred to by Goldman Chief Financial Officer David Viniar as *"the big short"*, peaked in June 2007[22] at $13.9 billion. As a result of this net short, the SPG Trading Desk generated third quarter revenues of about $2.8 billion, which were offset by losses on other mortgage desks, but still left the Mortgage Department with more than $741 million in profits. Altogether in 2007, Goldman's net short positions from derivatives generated net revenues of $3.7 billion. These positions were so large and risky that the Mortgage Department repeatedly breached its risk limits, and Goldman's senior management responded by repeatedly giving the Mortgage Department new and higher temporary risk limits to accommodate its trading.[23]

---

[20] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

[21] See http://money.cnn.com/2007/03/13/news/companies/new_century/index.htm for New Century Financial Corporation's subpoena on February 28, 2007 from the US Attorney Office's.

[22] Goldman's peak short position of $13.9 billion in June of 2007 was only months from New Century's April 2007 bankruptcy, their subpoena from the U.S. Attorney on February 28, 2007, the creation of GSAMP Trust 2007 – NC1 on February 1, 2007, and the complainant's refinance into an ARM mortgage with New Century on November 28, 2006.

[23] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

21. At one point in 2007, Goldman's Value-at-Risk measure to build its net short positions, Goldman's Mortgage Department personnel used structured finance products to engage in multiple, complex transactions. Its efforts included selling high risk loans, RMBS, CDO, ABX, and other mortgage related assets from its inventory and warehouse accounts; shorting RMBS and CDO securities, either by shorting the assets themselves or by taking the short side of CDS contracts that referenced them, in order to profit from their fall in value; and shorting multiple other mortgage backed assets simultaneously, including different tranches of the ABX Index, tranches of CDO's, and CDS contracts on such assets[24]. To lock in its profits after the short assets fell in value, Goldman often entered into offsetting CDS contracts to *"cover its shorts"*. Senior Goldman executives directed and monitored these activities.[25]

22. The evidence reviewed by the U.S. Subcommittee shows that some of the transactions leading to Goldman's short positions were undertaken to advance Goldman's own proprietary financial interests and not as a function of its market making role to assist clients in buying or selling assets. In the end, Goldman profited from the failure of many of the RMBS and CDO securities it had underwritten and sold. As Goldman CEO Lloyd Blankfein explained in an internal email to his colleagues in November 2007… *"Of course we didn't dodge the mortgage mess. We lost money, then made more than we lost because of shorts."*[26]

---

[24] See https://fisher.osu.edu/blogs/efa2011/files/REF_2_2.pdf and **EXHIBIT – 2G** for 2011's report *"The Bear's Lear: Index Credit Default Swaps and the Subprime Mortgage Crisis"* (Page 14) for Goldman's CDS referencing GSAMP Trust 2007 – NC1, to which the complainant's New Jersey property was pooled.

[25] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

[26] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

23. **Covering Shorts to Lock In Profits.**  To understand how Goldman profited from its short positions, it is important to understand references in its internal documents to *"covering"* or *"monetizing"* its shorts.  When Goldman built its short positions, it generally used CDS contracts to short a variety of mortgage related securities, including individual RMBS and CDO securities and baskets of 20 RMBS securities identified in the ABX indices.[27]  Goldman's shorts then gained or lost value over time, depending upon how the underlying referenced assets performed during the same period.  Most CDS contracts expire after a specified number of years.  During the covered period, the short party makes periodic premium payments to the opposing long party in the CDO.  The short party is essentially betting that a *"credit event"*[28] will take place during the covered period that will result in the long party having to provide it with a large payment that outweighs the cost of the short party's premium payments.  However, the short party does not have to wait for a credit event in order to realize a gain on its CDS contract.[29]  A similar view as to why the CDO business continued to operate despite increasing market risk was expressed by a former executive at the hedge fund Paulson & Co.,[30] is an email exchange with another investor in 2007.  The Paulson executive wrote:

> *"It is true that the market is not pricing the subprime RMBS wipeout scenario. In my opinion this situation is due to the fact that rating agencies, CDO managers*

---

[27] See https://fisher.osu.edu/blogs/efa2011/files/REF_2_2.pdf and **EXHIBIT – 2G** for 2011's report *"The Bear's Lear: Index Credit Default Swaps and the Subprime Mortgage Crisis"* (Page 14) for Goldman's CDS referencing GSAMP Trust 2007 – NC1, to which the complainant's New Jersey property was pooled.

[28] See **EXHIBITS –2E, N, M** for the manipulated "credit event" upon the complainant's property, triggered by the tactics used by the Goldman and substantiated by May 2011's whistleblower allegations by a Litton Loan Servicing LP employee to the Federal Reserve Bank of NY, detailing a denial sweep program where qualified homeowners were deliberately denied federal HAMP loan modifications, http://www.housingwire.com/news/litton-loan-whistle-blower-letter-given-ny-fed

[29]**IMPORTANT FACTS ABOUT CDS:**  Under standard Credit Default Swaps contracts designed by the International Swaps and 1552 Derivatives Association (ISDA), a credit event is defined as a (1) bankruptcy; (2) failure to pay; (3) restructuring; (4) repudiation of or moratorium on payment in the event of an authorized government intervention; or (5) an acceleration of an obligation.  Another common credit event is incurring a credit rating loss.

[30] See http://www.sec.gov/litigation/complaints/2010/comp21489.pdf for *Securities and Exchange Commission v. Goldman, Sachs & Co. and Fabrice Tourre, Civil Action No. 10 Civ. 3229 (S.D.N.Y. filed April 16, 2010* in July 2010 for $550 Million.

*and underwriters have all the incentives to keep the game going, while 'real
money' investors have neither the analytic tools nor the institutional framework to
take action before the losses that one could anticipate based [on] the 'news'
available everywhere are actually realized.* "[31]

24. **Partnering on Anderson.** GSC Partners was founded by Alfred C. Eckert, III, a former
partner and former head of private equity, distressed debt investing, and corporate finance
at Goldman Sachs. Goldman had a longstanding relationship with GSC. In addition to
Mr. Eckert, at least five other former Goldman Managing Directors were employed by
GSC, and at least eight other former and current Managing Directors had invested in one
or more of GSC's funds.[32] In the spring of 2006, GSC circulated information through
Goldman about raising money for its Elliot Bridge Fund, a *"fixed income arbitrage fund
focusing primarily on ABS using cash and synthetics, long/short strategies."* When
discussing the fund with other Goldman employees, Curtis Willing, the Goldman sales
representative responsible for covering GSC wrote: *"They are a strategic partner with
the Synthetic desk and have handed us multiple CDO/CLO mandates."* After being
informed of the internal conversations almost a month later, Goldman Executive Daniel
Sparks[33] informed Mr. Willing that it was a *"mistake not to involve me from early on,"*
telling Mr. Willing, *"I've run a bunch of traps for [GSC] in the past."* [34]

25. **Anderson Mezzanine Funding 2007-1 / Traces of New Century Mortgage.** In the
summer of 2006, Goldman began work on Anderson Mezzanine Funding 2007-1

[31] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings,
including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S.
Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS
Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL
CRISIS: Anatomy of a Financial Collapse"* of April 2011.

[33] See http://www.huffingtonpost.com/2010/04/29/daniel-sparks-goldman-sac_n_556532.html for article detailing
the former Goldman Executive Dan Sparks distortion of events before the U.S. Subcommittee in April 2010.

[34] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings,
including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S.
Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS
Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL
CRISIS: Anatomy of a Financial Collapse"* of April 2011.

(Anderson), a synthetic CDO whose assets were single name CDS contracts referencing subprime RMBS securities with mezzanine credit ratings. To execute the Anderson CDO, Goldman partnered with GSC Partners (GSC), a New York hedge fund. Goldman personnel working on the CDO included Peter Ostrem, head of the CDO Origination Desk, and Matthew Bieber, a CDO Origination Desk employee assigned to be deal captain for the Anderson CDO. The CDO was originally conceived as part of the Hudson series of non-managed, proprietary CDO's in which Goldman acted as the principal. But Goldman decided to enlist GSC to take part in structuring the $500 million CDO. GSC agreed to partner with Goldman on the Anderson CDO and to share in the associated risk, including by splitting the equity tranche and sharing the risk with Goldman that the Anderson assets would lose value while being warehoused. GSC also participated in selecting the assets for the CDO. Later on, Goldman consulted with GSC on whether to liquidate or underwrite Anderson, and allowed GSC to participate in pricing issues, while GSC at times assisted in marketing Anderson. Goldman offered to let GSC take a short interest in the CDO by offering to *"sell protection on BBBs to GSC at market for 0.75% times notional,"* and agreeing to *"source assets via GSC,"* meaning GSC could propose assets for the CDO that GSC wanted to get rid of or short. GSC responded by shorting a select group of RMBS securities to hedge its risk while those assets were in the Anderson warehouse account. For instance, at one point in October 2006, GSC sought to add $56 million in assets to the Anderson CDO, while also taking a short position on $9 million of those assets, which it described as *"GSC Hedge Amount."*[35]

26. **Designing Anderson.** GSC and Goldman participated together in the selection of assets for Anderson. Anderson was designed to be a synthetic CDO whose assets would consist solely of CDS contracts referencing RMBS securities whose average credit ratings would be BBB or BBB-. GSC proposed some of the referenced RMBS securities, but it is unclear how many were included in Anderson. GSC and Goldman employees

[35] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

interviewed by the U.S. Subcommittee had no specific recollection of the asset selection process, beyond each party selecting some RMBS securities and the other having veto rights. Anderson's assets were purchased from 11 different broker-dealers from September 2006 to March 2007. Goldman was the source of 28 of the 61 CDS contracts in Anderson, and Goldman retained the short side. The next largest short party was Lehman Brothers which sold six CDS contracts to Anderson and retained the short side. Goldman also served as the sole credit protection buyer to the Anderson CDO, acting as the intermediary between the CDO and the various broker dealers selling it assets. By February 2007, the Anderson warehouse account contained $305 million out of the intended $500 million worth of single name CDS, many of which referenced mortgage pools originated by New Century, Fremont, and Countrywide, subprime lenders known within the industry for issuing poor quality loans and RMBS securities. Approximately 45% of the referenced RMBS securities contained New Century mortgages.[36]

27. **Falling Mortgage Market.** During the same time period in which the Anderson single name CDS contracts were being accumulated, Goldman was becoming increasingly concerned about the subprime mortgage market, was reacting to bad news from the subprime lenders it did business with, and was building a large short position against the same types of BBB rated RMBS securities referenced in Anderson. By February 2007, the month Goldman (reportedly) pooled and securitized[37] 9,800 mortgages originated by New Century into GSAMP Trust 2007 – NC1, to which the complainant's mortgage was one,[38] the value of subprime RMBS securities was falling, and the Goldman CDO

---

[36] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

[37] As a result of the non-assignment of the complainant's NJ property to GSAMP Trust 2007 – NC1 by the February 1, 2007 cut-off per the prospectus seen at http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf (S-63), Judith T. Romano, an employee of Phelan Hallinan & Schmieg, PC executed a fraudulent assignment to the trust dated June 19, 2007, signing as the "Assistant Secretary and Vice President" of MERS, as seen in **EXHIBIT – 2D.**

[38] See http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf for more information about the Pooling and Servicing Agreement of February 1, 2007 that created GSAMP TRUST 2007 – NC1

Origination Desk was forced to mark down the value of the long single name CDS contracts in its CDO warehouse accounts, including Anderson.  Goldman was also aware that its longtime customer, New Century, was in financial distress.[39]

28. On February 7, 2007, New Century announced publicly it would be restating its 2006 earnings[40], causing a sharp drop in the company's share price. On February 8, 2007, Goldman's Chief Credit Officer Craig Broderick sent Mr. Sparks and others a press clipping about New Century and warned:

> *"[T]his is a materially adverse development. The issues involve inadequate [early payment default] provisions and marks on residuals.... [I]n a confidence sensitive industry it will be even if all problems have been identified. ... We have a call with the company in a few minutes (to be led by Dan Sparks)."*

On some occasions, Mr. Sparks addressed negative news about New Century in the same email he discussed liquidating assets in warehouse accounts for upcoming CDO's.  On March 8, 2007, for example, Mr. Sparks noted in an email to senior executives: *"New Century remains a problem"* due to loans experiencing early payment defaults, and informed them that the Mortgage Department had *"liquidated a few deals and could liquidate a couple more."*[41]

---

[39] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

[40] Six days after the creation of GSAMP Trust – NC1 on February 1, 2007, consisting of 9,800 New Century mortgages including the complainant's, the defunct originator announced it would be restating their 2006 earnings, validating the firms fraudulent undertaking s in that year which were later exposed.

[41] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

29. On February 23, 2007, Mr. Sparks sent an email to senior Goldman executives estimating that Goldman had lost $72 million on the holdings in its CDO warehouse accounts, due to falling prices. He directed Mortgage Department personnel to liquidate rather than securitize the assets in certain warehouse accounts. Two days later, on February 25, 2007, Mr. Sparks informed senior executives of the possibility of liquidating Anderson:

> *"[T]he CDO business liquidated 3 warehouses for deals of $530mm (about half risk was subprime related). ... One more CDO warehouse may be liquidated this week - approximately $300mm with GSC as manager."*

30. Three days later, David Rosenblum, head of Goldman's Collateralized Loan Obligations activities, emailed Mr. Ostrem, head of the CDO Origination Desk, stating:

> *"Dan tells me that SP [Structured Product] CDO desk has reported -77 [million dollars] from retained debt (Hmezz 1+2, etc), and -129 [million dollars] from unrealized and realized CDO WH [warehouse] markdowns."*

On February 24, 2007, several persons from Goldman's Mortgage Department worked to analyze the costs of unwinding and liquidating the assets collected for the Anderson CDO. Deeb Salem, a trader on the ABS Desk, estimated that unwinding Anderson would result in a $60 million loss due to the falling value of its single name CDS. On the same day, Mr. Ostrem sent his colleagues this explanation of why the losses in the CDO warehouse accounts were growing so rapidly:

> "Each warehouse is marked by either (a) MTM [mark-to-market] on each asset or (b) mark to model [MTModel] which involves taking the portfolio through the expected CDO execution and calculating Goldman's P&L [profit and loss] given current market yields on debt and equity. MTM is preferred if CDO execution is highly uncertain or portfolio is small. Both the MTM and the MTModel take into account risk sharing arrangements with 3rd parties. As CDO execution has become more uncertain we have moved a couple warehouses closer to their MTM which has significantly increased our losses. Also, our MTModel results have

shown losses as expected liability spreads have widened significantly and the overall strength of the CDO market has waned due to fundamental credit decline in 06/07 in RMBS subprime (90+% of assets) and increased co[r]relation between ABX/TABX levels and mezz debt levels in CDO's. We expect this co[r]relation to increase volatility in our warehouse marks for the [sic] a while (this series of events have happened quickly within the last month and the co[r]relation is getting closer to 1 as global markets get more familiar with fundamentals in subprime and trading levels in ABX/TABX).  Additional losses have also resulted from the liquidation of 3 warehouses. In each case, the realized loss from the sale of assets has been higher than our MTM or MTModel. This is attributable to both volatility in subprime markets and that our competitors are closing their CDO warehouse accounts from buying our subprime or CDO positions.[42] The buyer base has suddenly shrunk significantly. As this continues, we expect this lack of liquidity to further weaken our MTMs and feed into our losses in our remaining warehouse marks."[43]

31. At about 11 p.m. that Saturday night, February 24, 2007, Mr. Sparks seemed to reach a decision to liquidate Anderson.  He sent an email to Mr. Ostrem, Mr. Bieber, and several others stating: *"I want to liquidate Anderson Monday – we should begin the discussion with gsc asap."*  After Mr. Sparks relayed this decision, Ostrem and Bieber began to strategize ways to convince Mr. Sparks to reverse his decision. Ostrem and Bieber assembled a list of likely buyers of the Anderson securities to present to Mr. Sparks, and brainstormed about other CDO's that could potentially buy Anderson securities for their asset pools. Mr. Ostrem also proposed allowing a hedge fund to short assets into the deal as an incentive to buy the Anderson securities, but Mr. Bieber thought Mr. Sparks would

---

[42] Goldman Executives realized their competitors caught on to the inevitable decline in value of CDO's layered in subprime, including that held by Goldman, and there took short positions.  At this moment, Goldman aggressively followed suit as evident by their high short position of $13.9 billion by June 2007, CDS referencing RMBS including their own creations.

[43] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

want to *"preserve that ability for Goldman."* At some point, Mr. Sparks changed his mind and decided to go forward with underwriting the Anderson CDO. None of the Goldman personnel interviewed by the Subcommittee could recall why the final decision was made to go forward with Anderson. In one email on March 2, 2007, Sparks rejected any expansion of Anderson, responding: *"we are not ramping - execute deal as is."* The Anderson CDO closed on March 20, 2007. As finally constructed, 100% of its assets were CDS contracts referencing $307 million in mezzanine subprime RMBS securities, meaning RMBS securities carrying BBB or BBB- credit ratings. About 45% of the subprime mortgages in the referenced RMBS securities were issued by New Century[44]. Another 8% were issued by Countrywide, and almost 7% were issued by Fremont. Goldman took about 40% of the short side of the Anderson CDO. Ten other investors held the rest of the short interest in the CDO.[45]

32. **Selling Anderson.** During March, selling Anderson securities became a top priority for Goldman. Goldman even put another deal on hold, the Abacus 2007-AC1[46] deal with the Paulson hedge fund to promote Anderson. As Mr. Egol advised Goldman personnel: *"Given risk priorities, subprime news and market conditions, we need to discuss side-lining [Abacus 2007-AC1] in favor of prioritizing Anderson in the short term."* On March 13, 2007, Goldman issued internal talking points for its sales force on the Anderson CDO. Among the points highlighted were: *"Portfolio selected by GSC. Goldman is underwriting the equity and expects to hold up to 50%. ... Low fee structure[.] ... No reinvestment risk."* The talking points described Goldman as holding up to 50% of the equity tranche in the CDO – worth about $21 million, without

---

[44] See http://money.cnn.com/2007/04/02/news/companies/new_century_bankruptcy/ for New Century Financial Corporation's bankruptcy and insolvency as of April 2007.

[45] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

[46] See http://www.sec.gov/litigation/complaints/2010/comp21489.pdf for *Securities and Exchange Commission v. Goldman, Sachs & Co. and Fabrice Tourre, Civil Action No. 10 Civ. 3229 (S.D.N.Y. filed April 16, 2010* in July 2010 for $550 Million.

mentioning that Goldman would also be holding 40% – about $135 million – of the short side of Anderson, placing its investment interests in direct opposition to the investors to whom it was selling Anderson securities.  The large number of poor assets referenced in Anderson raised investor questions and was an impediment to sales. One potential investor wrote to a Goldman sales representative explaining its decision not to purchase the Anderson securities:

> *"We're going to pass on this deal for a number of reasons: Two bonds . . . have been downgraded or are on negative watch; Another 12 bonds in the portfolio are negatively impacted by the downgrades lower in the capital structure; 28% of the portfolio is failing delinquency triggers; We show that a lot of these bonds will take principal hits; Not crazy about the deal structure given the quality of the portfolio."[47]*

33. Other investors expressed concerns that the CDO would be downgraded.  Goldman, however, did not disclose to these investors that it had almost canceled the CDO, due to its assets' falling values.  Of particular concern for investors was the concentration of New Century mortgages in Anderson. On March 13, 2007, a potential investor, Rabobank, asked Goldman sales representatives: *"how did you get comfortable with all the new century [sic] collateral in particular the new century serviced deals – considering [sic] you are holding the equity and their servicing may not be around is that concerning for you at all?"* Goldman and GSC prepared a list of talking points with which to respond to the investor:[48]

---

[47] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

[48] This talking point demonstrates Goldman's fraudulent concealment, gross negligence, and willingness to deceive its clients for the sake of profit, for during this time period, New Century had received a subpoena from the U.S. Attorney's office, sought for questioning by the SEC, and removed from the NYSE, see http://www.nyse.com/press/2_2007.html

*"- Historically New Century has on average displayed much better performance in terms of delinq[uency] and default data - Prepayments have tended to be higher lowering the extension risk - Losses and REO [Real Estate Owned by a lender taking possession of a property] are historically lower than the rest of the market - Traditionally the structures have strong enhancement/subordination."*

The talking points did not disclose that, in fact, Goldman, too, was uncomfortable with New Century mortgages. On March 8, 2007, five days before receiving the investor's inquiry, Mr. Sparks had reported to senior Goldman executives, including Co-President Gary Cohn and CFO David Viniar, that New Century mortgages *"remain[ed] a problem for [early payment default]."* [49]

34. On March 13, 2007, the same day as the investor inquiry, Goldman personnel completed a review of New Century mortgages with early payment defaults that were on Goldman's books and found fraud, *"material compliance issues,"* and collateral problems. The review found that *"62% of the pool has not made any pmts [payments]"* and recommended *"putting back 26% of the pool"* to New Century for repurchase *"if possible."* Goldman also did not disclose to the investor that it was shorting 40% of the Anderson CDO. Some Goldman clients also had questions about GSC's involvement in Anderson. An Australian sales representative wanted *"more color on asset selection process, especially with respect to GSC involvement."* This clarification was necessary, because although GSC's role was mentioned in numerous internal Goldman documents, the official Anderson marketing materials did not mention GSC's role in asset selection. In previous drafts of the marketing materials, for example, Goldman stated that *"Goldman Sachs and GSC Group co-selected the assets"*; *"GSC pre-screens and evaluates assets for portfolio suitability"*; the CDO was *"cosponsored by Goldman and GSC Eliot Bridge Fund"*; and *"Goldman Sachs and GSC ha[ve] aligned incentives with*

---

[49] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

*Anderson Funding by investing in a portion of equity."* But all of the references to GSC were removed from the final documents.[50]

35. Mr. Bieber told the Subcommittee that he did not recall specifically why the references to GSC were removed, but recalled GSC having an issue with disclosing its name in the offering documents. Edward Steffelin, a Senior Trader at GSC, also did not recall the specifics regarding why the references to GSC were removed, but told the Subcommittee that he felt GSC's role in the Anderson CDO did not rise to the level of *"co-selecting."* Mr. Steffelin said that although GSC had the ability to suggest assets and veto others, he felt that *"co-selecting"* implied a level of control over the portfolio that GSC didn't have. Despite the poor reception by investors, Goldman continued *"pushing the axe"* with its sales force to sell Anderson securities. Mr. Bieber identified and monitored potential investors and attempted to sell Anderson securities to pension funds and place Anderson securities in other Goldman CDO's as collateral securities. On March 20, 2007, when Mr. Bieber reported selling $20 million in Anderson securities, his supervisor, Mr. Ostrem, responded with the single word: *"Profit!"* In a separate email a week later, Mr. Ostrem told Mr. Bieber he did *"an excellent job pushing to closure these deals in a period of extreme difficulty."* After several months of effort, Goldman was able to sell only a third, or about $102 million of the $307 million in Anderson securities. The nine investors included Beneficial Life, Moneygram, and GSC which purchased the entire $11 million class D portion of the CDO.[51]

---

[50] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

[51] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

36. **Losing Money from Anderson.**  Due to its inability to sell two-thirds of the Anderson securities, Goldman lost money overall on the CDO.  Goldman's biggest gain came from holding 40% of the short position on certain Anderson assets, which produced a $131 million gain at the direct expense of the investors to whom Goldman had sold the Anderson securities.  Goldman was also paid $200,000 for serving as the liquidation agent, and collected $2 million in CDS premiums while it warehoused Anderson assets.  Despite those gains, Goldman incurred a $185 million loss from the Anderson securities it was unable to sell and had to keep on its books.  It incurred another $122 million loss due to the decreased value of the securities Goldman had purchased as collateral for the CDO.  Anderson's nine investors suffered more substantial losses.  Seven months after its issuance, in November 2007, Anderson securities experienced their first ratings downgrades.  At that point, 27% of the assets underlying Anderson were downgraded below a B- rating.  GSC then sold back to Goldman a portion of the Anderson securities it had purchased at a price of 3 cents on the dollar.  Within a year, Anderson securities that were originally rated AAA had been downgraded to BB.  In the end, the Anderson investors were wiped out and lost virtually their entire investments.[52]

37. **Analysis.**  Goldman constructed the Anderson CDO using CDS contracts referencing New Century who were known for issuing poor quality loans.[53]  When potential investors asked how Goldman was able to *"get comfortable"* with the New Century mortgage pools referenced in Anderson, Goldman attempted to dispel concerns about the New Century loans, withheld information about its own discomfort with New Century, and withheld that it was taking 40% of the short side of the CDO, essentially betting against the very securities it was selling to its clients.  Instead, Goldman instructed its sales force to tell potential investors that Goldman was buying up to 50% of the equity tranche.

---

[52] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

[53] See http://www.ft.com/cms/s/0/df6f0bae-fbb3-11dc-8c3e-000077b07658.html#axzz2DUqCwu5x for report by bankruptcy court examiner regarding New Century Financial Corporation's troublesome financial state.

Goldman also did not disclose to potential investors that it had almost cancelled the CDO due to the falling value of its assets. On March 26, 2007, the Mortgage Department sought permission from Goldman's Mortgage Capital Committee to securitize and underwrite a new RMBS called GSAMP Trust 2007- HE2, which contained nearly $1 billion in subprime mortgage loans in a Goldman warehouse account, over 70% of which had been purchased from New Century. Goldman approved this securitization even though it knew at the time that New Century's subprime loans were performing poorly, many of the New Century loans in Goldman's inventory were problematic, and New Century was in financial difficulty.[54] The securitization was approved for issuance in April 2007, the same month New Century declared bankruptcy.[55] Goldman marketed and sold the RMBS securities to its clients. The securities first began to be downgraded in October 2007, and all of the securities have since been downgraded to junk status. Had Goldman not securitized the $2 billion in Fremont and New Century loans, the Mortgage Department would likely have had to liquidate the warehouse accounts containing them and either sell the loan pools or keep the high risk loans on its own books.[56]

38. On April 11, 2007, a Goldman salesman forwarded to Mr. Egol a scathing letter from a customer, a Wachovia affiliate, which had purchased $10 million in RMBS securities backed by Fremont loans and underwritten by Goldman. The client wrote that it was *"shocked"* by the poor performance of the securities *"right out of the gate,"* and concerned about Goldman's failure to have disclosed information about the poor quality of the underlying loans in the deal term sheet:

---

[54] See http://www.ft.com/cms/s/0/df6f0bae-fbb3-11dc-8c3e-000077b07658.html#axzz2DUqCwu5x for report by bankruptcy court examiner regarding New Century Financial Corporation's troublesome financial state.

[55] See http://money.cnn.com/2007/04/02/news/companies/new_century_bankruptcy/ for New Century Financial Corporation's bankruptcy and insolvency as of April 2007.

[56] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

"As you know, we own $10mm of the GSAMP 06-S3 M2 bond. ... We are shocked by how poorly this bond has performed right 'out of the gate' and had asked [Goldman] to send us the attached ProSupp [Prospectus Supplement]. After having read the ProSupp and compared it to the term sheet we have several concerns:

- According to the Pro supp, approximately $2.2mm ... of loans were delinquent when they were transferred to the trust. However, there is no mention of delinquent loans anywhere in the term sheet that was sent to investors when the deal was priced.

- According to the Pro supp, approximately $3.3mm ... are re-performing loans. However, there is no mention of re-performing loans anywhere in the term sheet.

- Approx. 53.14% of the loans in the deal allow for a Prepayment Premium and that all Prepayment Premiums collected from borrowers are paid to the Class P certificate holders.

None of this was disclosed in the term sheet and my concerns are two-fold: (1) The presence of Prepayment Premiums effects prepayment speeds which affects ... the deal's performance; (2) Prepayment Premiums are not staying inside the deal for the benefit of all investors but are being earmarked for the Class P holder (which is not mentioned in the term sheet). Note that ... $1.2mm in Prepayment Premiums has already been paid out to the Class P holder.

- The servicer must charge off any loan that becomes 180 days delinquent, giving rise to a Realized Loss inside the deal. Currently losses are at 9.71% of the original deal balance, or approximately $48mm despite the fact that the deal is only 11 months old (note that this figure already exceeds Moody's expectation for cumulative losses for the deal over the ENTIRE LIFE of the deal). I will also note that there are an additional $57.5mm of loans in the delinquency pipeline. This seems to indicate significant fraud at either the borrower or lender level ....

29

- Any subsequent recoveries on the charged-off loans do not inure to the
  benefit of all investors in the deal but ONLY to the Class X1 certificate
  holder.

This is not mentioned anywhere in the term sheet. Who owns the Class X1 notes?
Is that Goldman or an affiliate?  How much has been recovered so far? This is a
material fact to me especially considering that loss severities are coming in at
around 105% on the charged-off loans."[57]

39. **Reduced RMBS Business in 2008 fuels the "Mortgage Meltdown."**    Hence, April
2010's U.S. Subcommittee Investigations into Goldman Sachs' mortgage related
activities demonstrates that as early as 2006, prior to the creation of GSAMP Trust 2007
– NC1 to which the complainant's mortgage was (reportedly) pooled and securitized on
February 1, 2007[58], Goldman knew about the material defects within the mortgages
underwritten by defunct lenders such as New Century Mortgage, Countrywide, and
Fremont as evident in the devaluing of the RMBS and CDO's that the company created
in 2006 and years prior.  For instance, in an email obtained by the U.S. Subcommittee
Investigation of Goldman in 2010,[59] an employee of the Defendant when speaking about
the true value of the mortgages within 2006's RMBS and CDO's, mortgages that

---

[57] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings,
including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S.
Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS
Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL
CRISIS: Anatomy of a Financial Collapse"* of April 2011.

[58] As a result of the non-assignment of the complainant's NJ property to GSAMP Trust 2007 – NC1 by the
February 1, 2007 cut-off per the prospectus seen at
http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf (S-63), Judith T.
Romano, an employee of Phelan Hallinan & Schmieg, PC executed a fraudulent assignment to the trust dated June
19, 2007, signing as the "Assistant Secretary and Vice President" of MERS, as seen in **EXHIBIT – 2D**.

[59] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings,
including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S.
Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS
Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL
CRISIS:  Anatomy of a Financial Collapse"* of April 2011.

contained New Century originated loans, reads… *"These are all dirty 06' originations that we are going to trade as a block."*[60]

40. Nevertheless, Goldman continued to create more RMBS and CDO's consisting of loans pooled from the aforementioned *"dirty"* mortgage originators, as they did with GSAMP Trust 2007 – NC1, in February 2007 (the same month New Century Mortgage was subpoena by the U.S. Attorney General and investigated by the SEC)[61], the RMBS to which the complainant's New Jersey residential property was (reportedly) pooled[62]. Furthermore, Goldman paid for AAA ratings from Moody's, sold the RMBS and CDO's to investors worldwide including pension funds[63] and insurance companies[64], marketed as "AAA" rated, and as required by the Exchange Act, didn't disclose to investors Goldman's knowledge of the adverse conditions of the loans and the firms' short positions and CDS' against the RMBS and CDO's, all of which is substantiated in emails leading up to the credit crisis of 2008 from Goldman Sachs employees and controlling executives such as the CFO, COO, and CEO Lloyd Craig Blankfein.[65] In fact, a summation of Goldman's involvement during the lead up to the "Mortgage Meltdown" of

---

[60] See http://online.wsj.com/public/resources/documents/WSJ_GSQUOTES.pdf for Goldman Sachs' emails obtained by the U.S. Subcommittee in 2010, demonstrating the Defendants' inside knowledge about the true value of the RMBS and CDO's they sold to investors worldwide while the firm made billions more from their short positions and CDS against the RMBS and CDO's.

[61] See http://money.cnn.com/2007/03/13/news/companies/new_century/index.htm for New Century Financial Corporation's subpoena on February 28, 2007.

[62] As a result of the non-assignment of the complainant's NJ property to GSAMP Trust 2007 – NC1 by the February 1, 2007 cut-off per the prospectus seen at http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf (S-63), Judith T. Romano, an employee of Phelan Hallinan & Schmieg, PC executed a fraudulent assignment to the trust dated June 19, 2007, signing as the "Assistant Secretary and Vice President" of MERS, as seen in **EXHIBIT – 2D**.

[63] See http://sdnyblog.com/wp-content/uploads/2012/06/09cv01110-Order.pdf for *Public Employees Retirement System of Mississippi v. Goldman Sachs Group Inc., 09-cv-01110, U.S. District Court, Southern District of New York Manhattan*, settled in July 2012.

[64] See http://reaction.orrick.com/rs/emsdocuments/FinancialIndustryWeekInReview/17September2012/C.pdf for Prudential v. Goldman, New Jersey lawsuit from 2012.

[65] See http://online.wsj.com/public/resources/documents/WSJ_GSQUOTES.pdf for Goldman Sachs' emails obtained by the U.S. Subcommittee in 2010 demonstrating the Defendants' inside knowledge about the true value of the RMBS and CDO's they sold to investors worldwide while the firm made billions more from their short positions and CDS against the RMBS and CDO's.

2008, is an email from November 2007 from CEO Lloyd Craig Blankfein stating... *"Of course we didn't dodge the mortgage mess. We lost money, then made more than we lost because of short bets."* [66]

41. At the end of 2007, Goldman had substantially reduced its RMBS securitization business by selling its RMBS and CDO inventories to investors worldwide including pension funds, and guaranteed the firms' $3.7 Billion in profits from its short positions and CDS against the same RMBS and CDO's, while investors lost billions of dollars. In November 2007, in response to a request, Goldman provided specific data to the SEC about the decrease in its inventory of subprime mortgage loans and RMBS securities. Goldman informed the SEC that the value of its subprime loan inventory had dropped from $7.8 billion on November 24, 2006, to $462 million on August 31, 2007. Over the same time period, the value of its inventory of subprime RMBS securities had dropped from $7.2 billion to $2.4 billion, a two-thirds reduction. [67] Subsequently, October 2008's, largest recipients of TARP funds received by investment firms and banks includes Defendants to this complaint Bank of America ($45 Billion+)[68], Wells Fargo and its affiliates ($25 Billion+)[69], and Goldman Sachs ($10 Billion). [70] In addition, Litton Loan Servicing LP, mortgage servicer owned by Goldman Sachs from December 2007 to September 2011 (servicer of GSAMP Trust 2007 – NC1 to which the complainant's property was pooled), also received an $845 Million commitment in TARP funds with $76 Million disbursed in August 2009 as an incentive payment to grant qualified

[66] See http://online.wsj.com/public/resources/documents/WSJ_GSQUOTES.pdf for Goldman Sachs' emails obtained by the U.S. Subcommittee in 2010 demonstrating the Defendants' inside knowledge about the true value of the RMBS and CDO's they sold to investors worldwide while the firm made billions more from their short positions and CDS against the RMBS and CDO's.

[67] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

[68] See http://projects.propublica.org/bailout/list for list of TARP fund recipients.

[69] See http://projects.propublica.org/bailout/list for list of TARP fund recipients.

[70] See http://projects.propublica.org/bailout/list for list of TARP fund recipients.

homeowners federal HAMP loan modifications, [71] to which they denied the complainant
and her late husband starting in August 2008 throughout 2010, despite knowing the
coupled qualified for relief.  In addition, Deutsche Bank, Wells Fargo, Bank of America,
and Goldman Sachs also received part of $1.2 Trillion+ from October 2008's Federal
Emergency Relief Funds[72].

42. **Creating CDO's made millions for the Wall Street firms, CDS' and short positions
made them billions, and 2008's TARP made them more.**  According to the Securities
Industry and Financial Markets Association, $1.4 trillion worth of CDO's were issued in
the United States from 2004 through the end of 2007 with total CDO issuance reaching its
peak in 2006 at $520 billion, and then falling to a low of $4 billion in 2009.  From late
2006 through 2007, despite increasing mortgage delinquencies, RMBS losses, and
investor flight from the U.S. mortgage market, U.S. investment banks continued to issue
new CDO's consisting of loans from troubled originators such as the defunct New
Century, such as February 2007 GSAMP Trust 2007 – NC1 to which the complainant's
New Jersey residence was (reportedly) pooled[73], created by Goldman Sachs.[74]  Despite
pertinent knowledge of the defects within the mortgages originated by firms such as the
defunct New Century, Fremont, and Countrywide, investment banks such as Goldman
continued to pool and securitized thousands of mortgages into RMBS' and CDO's, sold
them to investors as AAA, and didn't disclose their short positions and CDS' on the very

---

[71] See http://projects.propublica.org/bailout/list for list of TARP fund recipients.

[72] See http://www.bloomberg.com/data-visualization/federal-reserve-emergency-
lending/#/overview/?sort=nomPeakValue&group=none&view=peak&position=0&comparelist=&search= for the
trillions in Federal Reserve Emergency Funds given to financial firms, including Defendants Goldman Sachs , Wells
Fargo, Deutsche Bank, and Bank of America  in the wake of the financial crisis of 2008

[73] As a result of the non-assignment of the complainant's NJ  property to GSAMP Trust 2007 – NC1 by the
February 1, 2007 cut-off per the prospectus seen at
http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf (S-63), Judith T.
Romano, an employee of Phelan Hallinan & Schmieg, PC executed a fraudulent assignment to the trust dated June
19, 2007, signing as the "Assistant Secretary and Vice President" of MERS, as seen in **EXHIBIT – 2D**.

[74] See http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf and
http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf for more information
about the Pooling and Servicing Agreement of February 1, 2007 that created GSAMP TRUST 2007 – NC1

same assets.  Because the fees charged to design and market CDO's were in the range of $5 to $10 million per CDO, investment banks had strong incentives to continue issuing CDO's despite increasing risks and waning investor interest, since reduced CDO activity meant less revenues for structured finance units and even the disappearance of CDO departments and trading desks, which is eventually what occurred.

43. Hence, the end result was billions of dollars lost by pension funds[75], insurance companies[76], and other investors worldwide, millions of foreclosures on U.S. homeowners, billions gained by investment firms such as Goldman from the CDS and short positions on the RMBS and CDO's, 2008's TARP funds paying at least $700 billion, and Federal Reserve Emergency Funds paying trillions+ to over 21,000 financial institutions including Defendants Goldman, Bank of America, their subsidiaries, and others.[77]  In 2008, Congress and the Executive Branch took a number of actions in response to the financial crisis resulting from Wall Streets' creation and short positions on Residential Mortgage Backed Securities (RMBS), Collateralized Debt Obligations (CDO), Asset Backed Securities (ABS), and Credit Default Swaps (CDS), the three of which were…

   i.   **Troubled Asset Relief Program (TARP).**  On October 3, 2008, Congress passed and President Bush signed into law the Emergency Economic Stabilization Act of 2008, P.L. 110-343. This law, which passed both Houses with bipartisan majorities, established the Troubled Asset Relief Program (TARP) and authorized the expenditure of up to $700 billion to stop financial institutions from collapsing and further damaging the U.S. economy. Administered by the Department of the Treasury, with support from the

---

[75] See http://sdnyblog.com/wp-content/uploads/2012/06/09cv01110-Order.pdf for *Public Employees Retirement System of Mississippi v. Goldman Sachs Group Inc., 09-cv-01110, U.S. District Court, Southern District of New York Manhattan*, settled in July 2012.

[76] See http://reaction.orrick.com/rs/emsdocuments/FinancialIndustryWeekInReview/17September2012/C.pdf for Prudential v. Goldman, New Jersey lawsuit from 2012.

[77] See http://projects.propublica.org/bailout/list for list of TARP fund recipients.

Federal Reserve, TARP funds have been used to inject capital into or purchase or insure assets at hundreds of large and small banks.

ii. **Federal Reserve Emergency Support Programs.** In addition, as the financial crisis began to unfold, the Federal Reserve aggressively expanded its balance sheet from about $900 billion at the beginning of 2008, to more than $2.4 trillion in December 2010[78], to provide support to the U.S. financial system and economy. Using more than a dozen programs, through more than 21,000 individual transactions, the Federal Reserve provided trillions of dollars in assistance to U.S. and foreign financial institutions in an effort to promote liquidity and prevent a financial collapse. In some instances, the Federal Reserve created new programs, such as its Agency Mortgage Backed Securities Purchase Program which purchased more than $1.25 trillion in mortgage backed securities backed by Fannie Mae, Freddie Mac, and Ginnie Mae.

iii. **Dodd-Frank Act.** On July 21, 2010, Congress passed and President Obama signed into law the Dodd-Frank Wall Street Reform and Consumer Protection Act, P.L. 111-203. This law, which passed both Houses with bipartisan majorities, expanded the authority of regulatory agencies to try to prevent future financial crises. Among other provisions, the law:

- expanded existing programs, such as by lowering the quality of collateral it accepted and increasing lending by the discount window.

- established a Financial Stability Oversight Council, made up of federal financial regulators and others, to identify and respond to emerging financial risks;

---

[78] See http://www.bloomberg.com/data-visualization/federal-reserve-emergency-lending/#/overview/?sort=nomPeakValue&group=none&view=peak&position=0&comparelist=&search= for the trillions in Federal Reserve Emergency Funds given to financial firms, including Defendants Goldman Sachs , Wells Fargo, Deutsche Bank, and Bank of America  in the wake of the financial crisis of 2008

- established a Consumer Financial Protection Bureau to strengthen protection of American consumers from abusive financial products and practices;

- restricted proprietary trading and investments in hedge funds by banks and other large financial institutions;

- prohibited sponsors of asset backed securities from engaging in transactions that would involve or result in a material conflict of interest with investors in those securities;

- established procedures to require nonbank firms whose failure would threaten U.S. financial stability to divest some holdings or undergo an orderly liquidation;

- strengthened regulation of credit rating agencies;

- strengthened mortgage regulation, including by clamping down on high cost mortgages, requiring securitizers to retain limited liability for securities reliant on high risk mortgages, banning stated income loans, and restricting negative amortization loans;

- required better federal regulation of mortgage brokers;

- directed regulators to require greater capital and liquidity reserves;

- required regulation of derivatives and derivative dealers;

- required registration of certain hedge funds and private equity funds;

- authorized regulators to impose standards of conduct that are the same as those applicable to investment advisers on broker-dealers who provide personalized investment advice to retail customers;

- abolished the Office of Thrift Supervision.

## V.   **FACTUAL ALLEGATIONS**

### A.  **November 28, 2006 – Present: "The Rogers Family"**

**44.** On November 8, 1999, husband and wife, the late Thomas and Frances Rogers (hereby referred to as complainant), became first time homeowners, purchasing a home in Willingboro, New Jersey for $84,343, with a fixed rate mortgage from Associates Financial Services.   Beginning with the $84,343 fixed rate mortgage purchase price in 1999, followed by the first of three subprime ARM refinances starting in 2002 with the last occurring in 2006 with a $190,800 ARM originated by the defunct New Century Mortgage, yielded a 226% increase in the appraised value[79] of their Willingboro, New Jersey property within seven years, contrary to the national average of 50%.[80] Hence, Willingboro Township is a community made up of 82.49% Non – White residents[81], 72.79% African American such as the complainant and the late Thomas Rogers.  Thus, Blacks and other minorities were prime targets for subprime mortgages from predator lenders[82] such as Ameriquest, Countrywide / Bank of America[83], and New Century[84].

---

[79] See Written Testimony of Patricia Lindsay, former Vice President of Corporate Risk at New Century, before the FCIC Hearing, April 7, 2010, http://fcic-static.law.stanford.edu/cdn-media/fcic.testimony/2010-0407-Lindsay.pdf, at 3, regarding fraudulent appraisals and other negligent underwriting tactics used by New Century.

[80] See http://www.ncpa.org/pdfs/st335.pdf for the National Center for Policy Analysis' June 2011 report "*The Housing Crash and Smart Growth*"(Page 4).

[81] See http://lwd.dol.state.nj.us/labor/lpa/census/2010/dp/dp1_bur/willingboro1.pdf for demographics for Willingboro, NJ per the 2010 Census.

[82] See http://www.pewhispanic.org/2009/05/12/through-boom-and-bust/ for the May 2009 report by the Pew Hispanic Center, detailing the erosion of homeownership gains made by African Americans and native born Latinos relative to whites as a result of the implosion of subprime mortgages that were pushed upon minorities by defunct lenders in greater numbers compared to whites.

[83] See http://www.responsiblelending.org/mortgage-lending/research-analysis/unfair-and-unsafe-countrywide-white-paper.pdf for February 2008's report by the Center for Responsible Lending, detailing Countrywide / Bank of America's unfair lending practices.

[84] See http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/2010-0407-Preliminary_Staff_Report_-_Securitization_and_the_Mortgage_Crisis.pdf for the FCIC report detailing a June 2004 presentation by New Century's Quality Assurance staff reporting that they had found severe underwriting errors, including evidence of predatory lending, federal and state violations, and credit issues, in 25% of the loans they audited in November and December 2003. As a result, in 2004, Chief Operating Officer and later CEO Brad Morrice recommended these results be removed from the statistical tools used to track loan performance, and in 2005, the department was dissolved and its personnel terminated.

45. In 2002, the couple started the first of three subprime ARM refinances on their New Jersey residence with the defunct Ameriquest for $144,250, a starting ARM of 9.59%. Thus, Ameriquest has since admitted its predatory lending practices towards minorities. [85] The next subprime refinance was in November 2004 with Encore Credit Corp[86], a $165,750 thirty year ARM with a starting rate of 8.19% (Encore was purchased by the defunct Lehman Brothers in 2007).[87]

46. Thus, November 28, 2006 marked the final of three subprime ARM refinances within four years by the Rogers, the last of which came from the defunct New Century Mortgage, a refinance for $190,800, with a starting adjustable rate of 7.05% **(SEE EXHIBIT – 2C)**. Hence, a Comparative Market Analysis from Trend MLS **(SEE EXHIBIT – 2H)** of 40 homes sold in 2006 within Willingboro, New Jersey, reveals an average sales price of $188,000. More specifically, 12 out of the 40 comparable properties were in the same subdivision as the complainant's property, all of which were financed with an average mortgage balance of $222,733, and a high of $270,000.

47. At the time of the Rogers final subprime ARM refinance of $190,800, the originator New Century, an Irvine, California corporation, was declared the second-biggest subprime[88]

---

[85] See http://www.ct.gov/dob/cwp/view.asp?a=2245&q=309018 for Ameriquest admitted predatory lending practices towards minorities. See http://www.publicintegrity.org/2011/04/18/4173/data-shows-deutsche-bank-was-key-patron-questionable-mortgage-lenders study declaring Ameriquest as "one of the nation's worst subprime sharks."

[86] See http://www.dsnews.com/articles/bear-stearns-acquires-encore-credit-corp-2007-02-13 for Lehman's purchase of Encore in 2007. In 2009, a federal court denied a joint motion made by 15 financial institutions including Ameriquest Mortgage Co. and Bear Sterns Residential Mortgage Corp. d/b/a Encore Credit, to dismiss the NAACP's landmark lawsuit challenging racial discrimination in sub-prime home mortgage lending.

[87] See http://jenner.com/lehman Lehman Bankruptcy of 2008 for Lehman's bankruptcy in 2008 due to the financial crisis resulting from the mortgage meltdown.

[88] See http://www.pewhispanic.org/2009/05/12/through-boom-and-bust/ for the May 2009 report by the Pew Hispanic Center, detailing the erosion of homeownership gains made by African Americans and native born Latinos relative to whites as a result of the implosion of subprime mortgages that were pushed upon minorities by defunct lenders in greater numbers compared to whites. Thus, Willingboro's residents are predominately non-white, 72% African American, the race of the Rogers. See http://lwd.dol.state.nj.us/labor/lpa/census/2010/dp/dp1_bur/willingboro1.pdf for demographics for Willingboro, NJ per the 2010 Census.

mortgage lender in the United States[89], and was headed by Defendant Brad A. Morrice, the President and CEO.  Frederic J. Forster, a lead independent director, served as a non-executive Chairman of the Board.  Furthermore, funds used by New Century Mortgage to originate its loans to homeowners often came from a 'warehouse' line of credit from Wall Street firms, including Defendant to this case, Goldman Sachs Group Inc.

48. On February 1, 2007, New Century entered into a pooling and servicing agreement with several entities, including Defendants to this complaint Goldman Sachs Group Inc., via its subsidiaries GS Mortgage Securities, Corp. (depositor), Goldman Sachs Mortgage Company (sponsor), and Avelo Mortgage, L.L.C. (servicer), Wells Fargo Bank, N.A., (master servicer & the securities administrator), Deutsche Bank National Trust Company (custodian), MERS (nominee), and Bank of America Corporation (trustee as successor by merger to LaSalle Bank National Association as of Oct. 2007).[90]  As a result, Goldman Sachs Group Inc., via its subsidiaries GS Mortgage Securities and Goldman Sachs Mortgage Company, declared within its prospectus that it securitized 9,800 mortgages by the February 1, 2007 cut-off date into a RMBS they called GSAMP TRUST 2007 – NC1[91], and offered $1,733,851,200 of mortgage backed certificates originated by the defunct New Century for sale to investors worldwide, including retiree pension funds[92] and insurance companies.[93]  Contrary to the prospectus for GSAMP Trust 2007 – NC1, the complainant's property was not assigned to GSAMP Trust 2007 – NC1 upon the

---

[89] See http://money.cnn.com/2007/03/12/news/companies/new_century/index.htm?postversion=2007031214

[90] See http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf for more information about the Pooling and Servicing Agreement of February 1, 2007 GSAMP TRUST 2007 – NC1

[91] See http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf for more information about GSAMP TRUST 2007 – NC1

[92] See http://sdnyblog.com/wp-content/uploads/2012/06/09cv01110-Order.pdf for *Public Employees Retirement System of Mississippi v. Goldman Sachs Group Inc., 09-cv-01110, U.S. District Court, Southern District of New York Manhattan,* settled in July 2012.

[93] See http://reaction.orrick.com/rs/emsdocuments/FinancialIndustryWeekInReview/17September2012/C.pdf for Prudential v. Goldman, New Jersey lawsuit from 2012.

February 1, 2007 cut-off date.[94]  Instead, 28 months after the cut-off date, Judith T. Romano[95], an employee of Phelan Hallinan & Schmieg, PC, executed a fraudulent assignment of the complainant's property to the trust, signing as the *"Assistant Secretary and Vice President"* of MERS on June 19, 2009, recorded with the Burlington County Clerk's Office July 29, 2009.

49. In August 2008, Avelo was integrated into Litton Loan Servicing, LP whom Goldman purchased in December 2007,[96] and LaSalle Bank National Association, the trustee, was replaced by Bank of America Corporation (hereby referred to as BOA), as successor by merger in October 2007.[97]  Hence, from the time they purchase their home in 1999 on out, the Rogers paid their monthly mortgage and other bills on time for they were both gainfully employed.  Hence with the refinance on November 28, 2006 with New Century, the Rogers continued paying their bills on time, including their monthly mortgage payment of approximately $1,300 a month via electronic drafts from their joint bank account[98] to...

   1. First, New Century from 2006 to early 2007

   2. Next, Avelo Mortgage, L.L.C. (hereby referred to as Avelo), a subsidiary and mortgage servicer of Goldman Sachs (eventually integrated in August 2008 with

---

[94] See **EXHIBITS 2C & 2D** along with http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-63, the prospectus for GSAMP Trust 2007 – NC1, cut of date February 1, 2007.  Although not a charge asserted by the complainant for release, the allegations set forth by complainant Frances Rogers as it pertains to Goldman's fraudulent activities with respect to GSAMP 2007 – NC1, reveal violations of the Exchange Act as seen on http://www.sec.gov/about/laws/sea34.pdf

[95] See http://www.lsnj.org/NewsAnnouncements/Foreclosure/materials/LSNJReport.pdf for *"Legal Services of New Jersey Report and Recommendation to the New Jersey Supreme Court Concerning False Statements And Swearing In Foreclosure Proceedings November 4, 2010."*  As a result of the non-assignment of the complainant's NJ property to GSAMP Trust 2007 – NC1 by the February 1, 2007 cut-off per the prospectus seen at http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf (S-63), Judith T. Romano, an employee of Phelan Hallinan & Schmieg, PC executed a fraudulent assignment to the trust dated June 19, 2007, signing as the "Assistant Secretary and Vice President" of MERS, as seen in **EXHIBIT – 2D**.

[96] See http://www.bloomberg.com/apps/news?pid=newsarchive&sid=av8fOkC1HHEc  for details pertaining to Goldman Sachs' purchase of Litton Loan Servicing, LP in 2007.

[97] See http://www.bizjournals.com/columbus/stories/2007/10/01/daily1.html for details pertaining to Bank of America's purchase of LaSalle Bank National Association in 2007

[98] See **EXHIBIT – 1Q** for proof the Rogers monthly mortgage payments came directly from their expense bank account, thus, displaying they made on time payments to New Century, Avelo, and Litton.

Goldman Sachs' subsidiary / mortgage servicer, Litton Loan Servicing, LP, hereby referred to as Litton) with whom the adjustable rate later increased to approximately $1,600 a month from Mid-2007 to August 2008.

3. Ending with electronic drafts to Litton **(SEE EXHIBIT – 1Q)**. Note, Litton was purchased by Goldman for $500 Million from the defunct company Credit- Based Asset Servicing and Securitization (C-BASS) on December 10, 2007.

50. In a letter dated August 10, 2008 **(SEE EXHIBIT – A)** from the late Thomas Rogers to Litton, the complainant's husband sought a loan modification from Litton due to his now decreased income resulting from his retirement as a union laborer in 2007, the year after he refinanced into an adjustable rate mortgage with New Century in November 2006. Thus, the starting teaser rate of 7.05% had already adjusted since the November 2006 refinance, increasing his payments by approximately $300 a month. In addition, Thomas Rogers and his wife were both type II diabetics requiring monies for their daily medications, and he attempted to refinance into a fixed rate mortgage but was unsuccessful as a result of his mortgage balance exceeding the market value of his property at the time[99]. In his letter dated August 10, 2008 to Litton, Thomas Rogers said in part…

> *"We are just managing to make our monthly mortgage payment, buy food, clothing, and medical needs at this point… If you could provide us with any alternative solutions to this situation we would be eternally grateful. If there is anything more that we should be doing we are more than willing to try just about anything…"*

51. Thus, a month went by without a response from Litton regarding Thomas Rogers' request for relief with a loan modification being that he qualified based upon his documented hardships submitted and confirmed as received by the accused. As a result, he and his

---

[99] See **EXHIBIT – 2J** for the Comparative Market Analysis reflecting that from May 2008 to December 2008, 9 properties sold in the same subdivision where the complainant's property is located, with an average sales price of $141,847, the highest price $183,000, relative to the $190,800 adjustable rate mortgage balance upon the complainant's property.

wife called Litton in September 2008 and were instructed by an employee of the accused to wait 90 days after the adjustable rate increased again on their mortgage in February 2009 and only then would Litton consider a request for a loan modification[100]. Nevertheless, the couple felt uneasy about the looming increase in their monthly mortgage payment come February 2009, and again, contacted Litton by letter dated December 26, 2008 **(SEE EXHIBIT – B)**, attempting to get a loan modification for which they qualified.   However, they were again directed by an employee of Litton to wait 90 days after the adjustable rate increased on February 2009 to seek a loan modification.  As a result, the couple decided to cancel their automatic drafts to Litton, in fear of over-drafting their bank account due to the increased monthly mortgage payment set to happen with the second adjustable rate increase coming in February 2009, and paid Litton January 2009's mortgage payment with a money order.

52. In January 2009, the Rogers' continued to call Litton via telephone, not understanding why the latter refused to open discussions about a loan modification in light of the couple having an excellent payment history ever since they financed the purchase of their home in 1999, along with payments to New Century, Avelo, and Litton, made on time by automatic withdraw from their joint bank account every month **(SEE EXHIBIT – 1Q)**. Furthermore, the Rogers had documented their hardships via letters to Litton on August 10, 2008 **(SEE EXHIBIT - A)** and again on December 26, 2008 **(SEE EXHIBIT - B)**, coupled with multiple phone calls to the accused, thus, demonstrating to Litton their desperate need and qualification for a loan modification.[101]

---

[100] See http://www.huffingtonpost.com/joel-sucher/goldman-sachs-and-litton-_b_2144452.html  for the account of an Ex- Litton employee detailing direct orders from Goldman in 2009 to deny loan modification s to homeowners despite their qualifications in pursuit of foreclosure.  Also see http://www.housingwire.com/news/litton-loan-whistle-blower-letter-given-ny-fed for May 2011's whistleblower allegations by a Litton Loan Servicing LP employee to the Federal Reserve Bank of NY, detailing a denial sweep program where qualified homeowners were deliberately denied federal HAMP loan modifications.

[101] See http://www.huffingtonpost.com/joel-sucher/goldman-sachs-and-litton-_b_2144452.html  for the account of an Ex- Litton executive detailing direct orders from Goldman in 2009 to deny loan modification s to homeowners despite their qualifications in pursuit of foreclosure.  Also see http://www.housingwire.com/news/litton-loan-whistle-blower-letter-given-ny-fed for May 2011's whistleblower allegations by a Litton Loan Servicing LP employee to the Federal Reserve Bank of NY, detailing a denial sweep program where qualified homeowners were deliberately denied federal HAMP loan modifications.

**53.** In February 2009, the adjustable rate increased for the second time on the residential mortgage upon the home of Thomas Rogers and his wife causing the monthly payment to increase approximately $300.00 per month. In addition, complainant Frances Rogers lost her job in December of 2008, causing her more stress, anxiety, and heart problems for which she was hospitalized and prescribed daily beta blocker medication in addition to the daily medications she already took for type II diabetes.[102] Thomas Rogers and his wife's medical conditions, an "underwater mortgage"[103], along with an even greater decrease in their household income, further qualified them for a loan modification under the federal Home Affordable Modification Program (HAMP) with defendant Litton per the federal guidelines pledged to by the accused.[104]

**54.** Unable to make their mortgage payment for February 2009 or get any answers regarding their request for a deserved federal HAMP loan modification from Litton via telephone or by letter, the complainant sent another communication by fax to the accused on February 27, 2009, attempting again to save her home **(SEE EXHIBIT - C).** The fax cover sheet reads…

> *"I am writing this correspondence with the prior dated faxes as evidence my continuous attempts to get help from Litton. I have been trying endlessly to speak with someone using the numbers I have, I have left a number of request for a return call with no response. I have been forthcoming with all the information we were instructed to present. Litton has known since January that I am unemployed as well as they have known that we would not be able to pay our mortgage even before I lost my job. We made it known in August of 2008 that we were in a hardship situation, and it is at this point that we are unable to pay either*

---

[102] These facts were explained by the late Thomas Rogers and his wife in the 1st and 2nd hardship letters, **SEE EXHIBITS – A & B.**

[103] See **EXHIBIT – 2J** for the Comparative Market Analysis reflecting that from May 2008 to December 2008, 9 properties sold in the same subdivision where the complainant's property is located, with an average sales price of $141,847, the highest price $183,000, relative to the $190,800 adjustable rate mortgage balance upon the complainant's property.

[104] See http://www.makinghomeaffordable.gov/programs/lower-payments/Pages/hamp.aspx for details about the Federal Home Affordable Modification Program.

*February or March's mortgage with only one income… I am requesting that you please respond to this correspondence…"*

55. In March 2009, already fearing foreclosure from an unreceptive Litton, Thomas Rogers was diagnosed with a 95% blockage in one of his heart valves that required surgery, and in April 2009, diagnosed with liver cancer which was treated twice with chemoembolization, while already battling type II diabetes (as explained in his 1st and 2nd hardship letters requesting relief for which he qualified), all of which required daily medication. Thus, unable to pay March & April of 2009's mortgage payment as a result of the second adjustable rate increase triggered February 2009, a reduced income, and deteriorating medical conditions, Thomas Rogers and his spouse, the complainant, continued calling Litton in hopes of securing a loan modification, and on April 18, 2009 **(SEE EXHIBIT - D)**, addressed another hardship letter to Litton, further detailing their latest medical misfortunes, and pleading for a loan modification, for their need exceeded the qualifying factors per the federal HAMP loan modification guidelines.

56. Unable to secure a loan modification with Litton on their own since August 2008[105], on April 21, 2009, the couple retained the legal services of Mattleman, Weinroth, & Miller, P.C., working directly with attorneys C. Gavin Opperman and Malcolm L. Block **(SEE EXHIBIT – E)** to assist them with securing a loan modification, for the attorneys reviewed the facts before them, and easily determined that the Rogers qualified for a loan modification per the federal HAMP guidelines.[106] Furthermore, Attorneys C. Gavin Opperman and Malcolm L. Block were experienced in helping homeowners negotiate loan modifications with mortgage servicers and lenders, and for only $2,000.00, represented Thomas Rogers and his wife, the complainant, from 2009 to 2011, assisting

---

[105] See http://www.huffingtonpost.com/joel-sucher/goldman-sachs-and-litton-_b_2144452.html for the account of an Ex-Litton executive detailing direct orders from Goldman in 2009 to deny loan modification s to homeowners despite their qualifications in pursuit of foreclosure.  Also see http://www.housingwire.com/news/litton-loan-whistle-blower-letter-given-ny-fed for May 2011's whistleblower allegations by a Litton Loan Servicing LP employee to the Federal Reserve Bank of NY, detailing a denial sweep program where qualified homeowners were deliberately denied federal HAMP loan modifications.

[106] See http://www.makinghomeaffordable.gov/programs/lower-payments/Pages/hamp.aspx for details about the Federal Home Affordable Modification Program.

the complainant with the task of saving her home even after the death of her husband, without seeking additional compensation for their services. As attested to by both aforementioned attorneys, what transpired over the next two years between themselves, the Rogers, and Litton, was *"extremely problematic due to Litton's poor communication..."* **(SEE EXHIBIT – H)**, contrary to Litton's original mission statement, *"to enable families to maintain homeownership."*

57. Despite Litton's full knowledge of the Rogers' documented hardships, of which consisted of the deteriorating health of the late Thomas Rogers, the then owned subsidiary of Goldman, continued to ignore the begging and qualified pleas for relief from the couple even though they qualified for a federal HAMP loan modification per the guidelines, to which Litton agreed with the government to uphold.[107] Furthermore, the couple contacted Litton in August 2008 **(SEE EXHIBIT – A)**, well before their adjustable rate mortgage increased in February 2009, notifying the accused of the upcoming second rate increase, their current hardships (which became more severe), their inability to secure a fixed rate refinance due to their mortgage balance exceeding the value of their property as of August 2008,[108] and their need for a loan modification for their income was reduced, only to be told by an employee of Litton to wait 90 days after February 2009's rate increase to request a loan modification.

58. From August 2008 to June 30 2009, Thomas Rogers and his wife Frances Rogers, the complainant, last days together on earth were spent constantly resubmitting the same documents requested by Litton since August 2008, sent to Litton by the Rogers and their attorneys[109], and countless phone calls to the accused attempting to get a response to their

---

[107] See http://www.makinghomeaffordable.gov/programs/lower-payments/Pages/hamp.aspx for details about the Federal Home Affordable Modification Program.

[108] See **EXHIBIT – 2J** for the Comparative Market Analysis reflecting that from May 2008 to December 2008, 9 properties sold in the same subdivision where the complainant's property is located, with an average sales price of $141,847, the highest price $183,000, relative to the $190,800 adjustable rate mortgage balance upon the complainant's property.

[109] See http://www.huffingtonpost.com/joel-sucher/goldman-sachs-and-litton-_b_2144452.html for the account of an Ex- Litton executive detailing direct orders from Goldman in 2009 to deny loan modification s to homeowners despite their qualifications in pursuit of foreclosure. Also see http://www.housingwire.com/news/litton-loan-whistle-blower-letter-given-ny-fed for May 2011's whistleblower allegations by a Litton Loan Servicing LP

request for a federal HAMP loan modification, all of which is substantiated by attorneys C. Gavin Opperman and Malcom L. Block. Despite delivery confirmations held by the complainant and the aforementioned attorneys revealing their cooperation in providing all that was requested by the Litton for a loan modification, the accused continuously ignored and stalled the request sought by the Rogers and their attorneys for a loan modification despite the couple meeting and exceeding the qualifications set forth by the federal HAMP loan modification guidelines.[110]

59. Thus, unknowingly to the Rogers and their attorneys during their attempt to get a loan modification from Litton, their property was not assigned to GSAMP Trust 2007 – NC1 until Judith T. Romano,[111] an employee of Phelan Hallinan & Schmieg, PC, fraudulently executed a transfer of the complainant's note to the trust by signing as the "*Assistant Secretary and Vice President*" of MERS on June 19, 2009, recorded with the Burlington County Clerk's Office July 29, 2009, although declared by Goldman Sachs already assigned to the trust by the cut- off date February 1, 2007[112] **(SEE EXHIBITS – 2C & 2D).** Thus, on June 30, 2009, the husband of the complainant, Thomas Rogers, succumbed to cancer **(SEE EXHIBIT – F)**, and on the same day Phelan Hallinan & Schmieg, PC's attorneys Rosemarie Diamond and Vladimir Palma filed a fraudulent Foreclosure Complaint with the Office of the Clerk of the Superior Court of New

---

employee to the Federal Reserve Bank of NY, detailing a denial sweep program where qualified homeowners were deliberately denied federal HAMP loan modifications.

[110] See https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_32.pdf for the HAMP Handbook for Servicers of Non-GSE Mortgages, where the U.S. Treasury requires mortgage servicers to *actively* solicit borrowers to participate in HAMP *before* referring a loan to foreclosure or conducting a scheduled foreclosure sale.

[111] See http://www.lsnj.org/NewsAnnouncements/Foreclosure/materials/LSNJReport.pdf for "*Legal Services of New Jersey Report and Recommendation to the New Jersey Supreme Court Concerning False Statements And Swearing In Foreclosure Proceedings November 4, 2010.*" As a result of the non-assignment of the complainant's NJ property to GSAMP Trust 2007 – NC1 by the February 1, 2007 cut-off per the prospectus seen at http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf (S-63), Judith T. Romano, an employee of Phelan Hallinan & Schmieg, PC executed a fraudulent assignment to the trust dated June 19, 2007, signing as the "Assistant Secretary and Vice President" of MERS, as seen in **EXHIBIT – 2D**.

[112] See http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-63, the prospectus for GSAMP Trust 2007 – NC1, cut of date February 1, 2007.

Jersey despite **(SEE EXHIBIT – 2E)** not filing the fraudulent assignment of the property to GSAMP Trust 2007 – NC1 with the Burlington County Clerk's office until July 29, 2009 **(SEE EXHIBIT – 2D)**.

60. The last thoughts and concerns of Thomas Rogers shared with his wife and attorney Malcolm Block, were regarding Litton's, acting on behalf of GSAMP Trust 2007 – NC1, unwillingness to execute a federal HAMP loan modification, leaving Thomas to believe they were out to foreclose on his home which would leave in his wife homeless.  In a letter written and signed by the complainant on July 20, 2009 **(SEE EXHIBIT – G)** addressed to Litton, the complainant, now a grief stricken widow, again begged for the mercy of the accused, seeking an overdue loan modification for which she and her late husband qualified, and with the recent death of her husband on June 30, 2009, her need and qualification for a federal loan modification was now increased.

61. Unknowingly to the complainant and her attorneys at the time, in August 2009, Litton accepted a pledge of $845.6 Million in TARP funds, $76.3 Million of which was disbursed that month, as an incentive payment to grant qualified homeowners such as the complainant and her late husband, with federal HAMP loan modifications.  In addition, other parties to GSAMP Trust 2007 – NC1 and Defendants to this complaint received TARP funds[113] as follows...

- Wells Fargo Bank, N.A. received $571,863,572, its parent Wells Fargo received $25 billion,
- Bank of America Corporation and its affiliates, including Bank of America, N.A., received $45 billion and $750,826,541,
- Goldman received $10 Billion.

In addition, Defendants Goldman Sachs Group Inc., Bank of America Corporation (parent company of Bank of America, N.A.), Wells Fargo (parent company of Wells Fargo Bank, N.A.), and Deutsche Bank AG, (the parent company of Deutsche Bank

---

[113] See http://projects.propublica.org/bailout/list for list of TARP fund recipients.

National Trust Company) all received a portion of the $1.2 trillion+ in Federal Reserve Emergency Funds starting in October 2008.[114]

62. Simultaneously, the same month Litton received $76.3 Million in TARP funds as an incentive payment to grant qualified homeowners such as the complainant with a loan modification, the Burlington County Clerk's office received on August 20, 2009 a civil action notice of lis pendens on the complainant's New Jersey property **(SEE EXHIBIT – 2E)** sent by the Defendant's legal counsel Phelan Hallinan & Schmieg, PC, on behalf of GSAMP Trust 2007 – NC1. Shortly thereafter, the Defendant's sent a letter via the U.S. Postal Service dated August 27, 2009 **(SEE EXHIBIT – N)**, addressed to "Thomas Rogers", acknowledging his death, requesting from the complainant the same items that were sent multiple times over a 12 month span from the Rogers and their attorneys, including the Deed of Ownership which Litton already possessed per their loan file showing that Frances Rogers was a co-borrower as recorded with the Burlington County Clerk's office by New Century in December 2006.[115] Nevertheless, the August 2009 letter from Litton ended with the following line, *"The loan has been referred for foreclosure proceedings. To request a reinstatement or payoff amount, please contact Phelan, Hallinan & Schmieg, LLP..."*

63. Defendant Litton continued to ignore the numerous phone calls from the complainant and her attorneys, demanded they re-fax the same documents that were received by Litton months earlier[116] from the Rogers, rigorously questioned the complainant's ownership of

---

[114] See http://www.bloomberg.com/data-visualization/federal-reserve-emergency-lending/#/overview/?sort=nomPeakValue&group=none&view=peak&position=0&comparelist=&search= for the trillions in Federal Reserve Emergency Funds given to financial firms, including Defendants Goldman Sachs and Bank of America, in the wake of the financial crisis of 2008

[115] See **EXHIBIT - 2C** for Litton upon the death of Thomas Rogers in June of 2009 to late 2010, questioned Frances Rogers' ownership rights in the property despite knowing she was the owner as evident within the mortgage recording with the Burlington County Clerk's office on December 12, 2006.

[116] See http://www.huffingtonpost.com/joel-sucher/goldman-sachs-and-litton-_b_2144452.html for the account of an Ex- Litton executive detailing direct orders from Goldman in 2009 to deny loan modification s to homeowners despite their qualifications in pursuit of foreclosure. Also see http://www.housingwire.com/news/litton-loan-whistle-blower-letter-given-ny-fed for May 2011's whistleblower allegations by a Litton Loan Servicing LP

the property[117], disregarded a letter from the complainant's psychologist dated August 25, 2009 sent to the Defendant declaring the complainant was undergoing grief and bereavement counseling upon the death of her husband **(SEE EXHIBIT - L),** and their medical recommendation that the complainant was not fit to return to work for several weeks for the sake of her health.  Hence, per the HAMP Handbook for Servicers of Non-GSE Mortgages, the U.S. Treasury required Litton to actively solicit borrowers to participate in HAMP before referring a loan to foreclosure or conducting a scheduled foreclosure sale.  However, as evident by the actions of the Defendant's demonstrated in **EXHIBITS – 2D & 2C,** along with subsequent correspondences sent via the U.S. Postal Service and communicated to the complainant by telephone, their primary objective was to deny the complainant a federal loan modification[118] in pursuit of foreclosure.[119]

64. Shortly thereafter, Litton informed Frances Rogers and her attorneys of their decision to grant the complainant a "Trial Period Modification," (not a federal HAMP loan modification) requiring three payments of approximately $1,900 due on October 1, 2009, November 28, 2009, and December 1, 2009.  Upon making one of the three "Trial Period" payments, Litton agreed with the complainant and her attorneys to execute a permanent modification with ongoing mortgage payments from the homeowner of approximately $1700 a month.  However, in a letter dated October 2, 2009 **(SEE**

---

employee to the Federal Reserve Bank of NY, detailing a denial sweep program where qualified homeowners were deliberately denied federal HAMP loan modifications.

[117] See **EXHIBIT - 2C** for Litton upon the death of Thomas Rogers in June of 2009 to late 2010, questioned Frances Rogers' ownership rights in the property despite knowing she was the owner as evident within the mortgage recording with the Burlington County Clerk's office on December 12, 2006.

[118] See https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_32.pdf   for the HAMP Handbook for Servicers of Non-GSE Mortgages, where the U.S. Treasury requires mortgage servicers to *actively* solicit borrowers to participate in HAMP *before* referring a loan to foreclosure or conducting a scheduled foreclosure sale.

[119] See http://www.huffingtonpost.com/joel-sucher/goldman-sachs-and-litton-_b_2144452.html  for the account of an Ex- Litton executive detailing direct orders from Goldman in 2009 to deny loan modification s to homeowners despite their qualifications in pursuit of foreclosure.  Also see http://www.housingwire.com/news/litton-loan-whistle-blower-letter-given-ny-fed for May 2011's whistleblower allegations by a Litton Loan Servicing LP employee to the Federal Reserve Bank of NY, detailing a denial sweep program where qualified homeowners were deliberately denied federal HAMP loan modifications.

**EXHIBIT – H)**, sent by the complainant's attorney, C. Gavin Opperman of Mattleman, Weinroth, & Miller, P.C., the attorney addressed the certified funds in the amount of $3,812.08 sent from Frances Rogers to the Litton, equaling two out of three mortgage payments paid by the complainant in advance, as an action of good faith to Litton, in order to begin the "Trial Modification Period." Hence, the payments were accepted and cashed by the accused without them finalizing the modification plan as promised by Litton to the complainant and her attorneys. In the letter to Litton, attorney C. Gavin Opperman said…

> *"This account has been extremely problematic due to Litton's poor communication, and as of our last verification (again) on October 1, 2009, all documentation has been received and is complete for completion of the Modification Confirmation. Kindly apply the above payments, which were initially paid in a timely manner pursuant to the trial period, to the account, and provide Ms. Rogers with documentation reflecting the confirmed modification as soon as possible".[120]*

65. The above statements from the letter written by the complainant's attorney **(SEE EXHIBIT – H)** reveals that Litton had agreed to a loan modification with Frances Rogers and her attorneys upon the condition that she begin making a serious of 3 payments which she paid two out of three payments in advance. Hence, the complainant, in good faith, made not one but two out of three payments in advance to Litton and provided again, several pieces of documentation, including proof of the Deed of Ownership.[121] Thus, Litton's own files demonstrated the complainant was a co-borrower on the New Century refinance of 2006, and she had already sent her proof of ownership

---

[120] See http://www.huffingtonpost.com/joel-sucher/goldman-sachs-and-litton-_b_2144452.html for the account of an Ex- Litton executive detailing direct orders from Goldman in 2009 to deny loan modification s to homeowners despite their qualifications in pursuit of foreclosure. Also see http://www.housingwire.com/news/litton-loan-whistle-blower-letter-given-ny-fed for May 2011's whistleblower allegations by a Litton Loan Servicing LP employee to the Federal Reserve Bank of NY, detailing a denial sweep program where qualified homeowners were deliberately denied federal HAMP loan modifications.

[121] See **EXHIBIT - 2C** for Litton upon the death of Thomas Rogers in June of 2009 to late 2010, questioned Frances Rogers' ownership rights in the property despite knowing she was the owner as evident within the mortgage recording with the Burlington County Clerk's office on December 12, 2006.

to Litton multiple times over the course of several months as confirmed by the comments of attorney for the complainant, C. Gavin Opperman. Furthermore, the attorneys' comments and files also indicate that Litton was demonstrating *"poor communication"* for numerous reasons, several of which included the non-acknowledgement of receipt of confirmed documents from both the complainant and her attorneys sent by fax and mail, accepting, cashing, and not applying to the complainant's account 2 out of 3 payments she made in advance to begin a loan modification, and Litton's failure to complete their end of the bargain[122], for the complainant completed her end of the bargain by making two out of three payments in advance even though Litton's "Trial Modification Period" only called for 1 payment in order to execute the permanent loan modification.

66. Still fighting for a confirmed loan modification with the assistance of her attorneys, the complainant again sent to Litton another hardship letter dated October 23, 2009 (**SEE EXHIBIT – I**), again begging Litton for a loan modification, detailing her reduced income, failing health, and ongoing grief resulting from her husbands' death in June 2009 (**SEE EXHIBIT – L for the Plaintiffs' licensed psychologist evaluations and recommendations**). Litton, however, continued their non-acknowledgement of Frances Rogers as the homeowner or next to kin despite her being on the Deed of Ownership and a borrower on the 2006 refinance with New Century Mortgage.[123]  Instead, Litton fully reneged on its promise to grant a loan modification to the complainant, kept the complainant's payments made towards the "Trial Period Modification", did not offer the complainant a federal HAMP loan modification as they were required[124], and continued

---

[122] See http://www.huffingtonpost.com/joel-sucher/goldman-sachs-and-litton-_b_2144452.html  for the account of an Ex- Litton executive detailing direct orders from Goldman in 2009 to deny loan modification s to homeowners despite their qualifications in pursuit of foreclosure.

[123] See **EXHIBIT - 2C** for Litton upon the death of Thomas Rogers in June of 2009 to late 2010, questioned Frances Rogers' ownership rights in the property despite knowing she was the owner as evident within the mortgage recording with the Burlington County Clerk's office on December 12, 2006.

[124] See https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_32.pdf  for the HAMP Handbook for Servicers of Non-GSE Mortgages, where the U.S. Treasury requires mortgage servicers to *actively* solicit borrowers to participate in HAMP *before* referring a loan to foreclosure or conducting a scheduled foreclosure sale.

to accept and cash monthly mortgage payments from her over the time frame of October 2009 to September 2010, sometimes not crediting the complainant's account **(SEE EXHIBIT – 1S)**.

67. In a letter sent through the U.S. Postal Service, dated October 27, 2009 **(SEE EXHIBIT – O)**, addressed, not to the complainant, rather her attorneys and her deceased husband, Litton again requested the same documentation that had been sent to them multiple times[125] over a 12 month span **(SEE EXHIBITS - C, H, J, 1B, 1H)** by mail and fax from both the complainant, her late husband, and her attorneys.  Furthermore, the proof of ownership that was consistently requested by Litton from the complainant was for not because she was a borrower on the refinance from 2006 with the defunct New Century, the files of which Litton had in its possession.[126]  As a result, the complainant's attorney, Malcolm Block, sent a letter to Litton dated November 9, 2009 **(SEE EXHIBIT – J)**, in which he highlighted Litton's negligent, unethical, and incompetent tactics for they reneged on a promise made to both the complainant, her late husband, and their attorneys' to provide a loan modification[127], for which Frances Rogers and her late husband Thomas Rogers qualified as early as August 2008.   In his letter, attorney Malcolm Block says:

*"1. On September 9, 2009, we had a conference call from our office with*

[125] See http://www.huffingtonpost.com/joel-sucher/goldman-sachs-and-litton-_b_2144452.html for the account of an Ex- Litton executive detailing direct orders from Goldman in 2009 to deny loan modification s to homeowners despite their qualifications in pursuit of foreclosure.  Also see http://www.housingwire.com/news/litton-loan-whistle-blower-letter-given-ny-fed for May 2011's whistleblower allegations by a Litton Loan Servicing LP employee to the Federal Reserve Bank of NY, detailing a denial sweep program where qualified homeowners were deliberately denied federal HAMP loan modifications.

[126] See **EXHIBIT - 2C** for Litton upon the death of Thomas Rogers in June of 2009 to late 2010, questioned Frances Rogers' ownership rights in the property despite knowing she was the owner as evident within the mortgage recording with the Burlington County Clerk's office on December 12, 2006.

[127] See http://www.huffingtonpost.com/joel-sucher/goldman-sachs-and-litton-_b_2144452.html for the account of an Ex- Litton executive detailing direct orders from Goldman in 2009 to deny loan modification s to homeowners despite their qualifications in pursuit of foreclosure.  Also see http://www.housingwire.com/news/litton-loan-whistle-blower-letter-given-ny-fed for May 2011's whistleblower allegations by a Litton Loan Servicing LP employee to the Federal Reserve Bank of NY, detailing a denial sweep program where qualified homeowners were deliberately denied federal HAMP loan modifications.

*representative, Tony Slaughter. Ms. Rogers was present and took part in the call. Mr. Slaughter advised that all documentation, including the Authorization had been received. He requested only a signed copy of the 2006 tax returns. The tax return was signed and returned to Litton Loan by Ms. Rogers immediately."*

*"2. On October 1, 2009, Mrs. Rogers received a Home Affordable Modification Trial Period Plan ("Plan"). Payments were in the amount of $1,906.04 each for three months (10/1/2009, 11/28/2009 and 12/1/2009). Mrs. Rogers had made the October 1, 2009 and November 1, 2009 payments. WE HAVE NOT RECEIVED A SIGNED COPY OF THE SIGNED PLAN FROM LITTON. We have made repeated requests for a signed copy of the Plan."*

*"3. On October 14, 2009, I spoke to representative, Michael. He confirmed receipt of all documents."*

*"4. On October 22, 2009, I spoke to representative who advised that a signed copy of the Loan Modification Plan will be sent."*

*"5. On October 29, 2009, I advised representative, Brenda, that I forwarded, by fax, an updated Authorization dated October 29, 2009, as hereinafter set forth."*
*"6. On November 2, 2009, I spoke to a representative and was advised that Mrs. Rogers had to forward one of five documents indicating that she has "rights to the property". Mrs. Rogers (after sending a certified copy of Mr. Rogers' Death Certificate) immediately forwarded a copy of the Deed of Ownership. I faxed a copy of the Deed to Litton on November 3, 2009. A copy of my fax confirmation of receipt and the Deed is attached. The representative had confirmed the Authorization before speaking with me regarding the property Deed."*

68. Another letter sent to Litton by the complainant's lawyers dated November 10, 2009 **(SEE EXHIBIT – K)**, again addressed the issue of resending documents[128] that were already sent over a 12 month time frame and two checks in the total amount of $3,812.06 accepted by Litton for two out of three monthly mortgage payments made in advance by the complainant towards the "Trial Period Plan" (not a federal HAMP loan modification) designed by Litton, thus, exceeding the payment requirements within Litton's "Trial Period Plan", effective October 1, 2009. Unknowingly to the complainant and her attorneys at the time, in 2008 Goldman Sachs, the owner of Litton accepted $10 Billion in TARP funds (followed by a portion of $1.2 trillion in Federal Reserve Emergency Funds[129]), with its servicer getting an additional pledge of $845 Million in TARP funds, $76 Million of which was disbursed in August 2009 as incentive payments to grant qualified homeowners, such as the complainant, a federal HAMP loan modification.[130]

69. Hence, throughout 2010 the Defendant's continued their efforts to unjustly foreclose on the complainant's residential property by accepting some payments and rejecting others for reasons such as failing to reference the complainant's deceased husband on the check as evident within two letters dated July 2, 2010 and August 2, 2010 **(SEE EXHIBITS – P & R)**, sent through the U.S. Postal Service addressed to Frances Rogers. Another letter from the accused sent by the U.S. Postal Service dated September 2, 2010, this time addressed to *"Thomas Rogers (Deceased)"*, not the complainant like the previous two letters, declined another check for enclosing only $1,757.94, *"not enough to pay the full*

---

[128] See http://www.huffingtonpost.com/joel-sucher/goldman-sachs-and-litton-_b_2144452.html for the account of an Ex- Litton executive detailing direct orders from Goldman in 2009 to deny loan modification s to homeowners despite their qualifications in pursuit of foreclosure. Also see http://www.housingwire.com/news/litton-loan-whistle-blower-letter-given-ny-fed for May 2011's whistleblower allegations by a Litton Loan Servicing LP employee to the Federal Reserve Bank of NY, detailing a denial sweep program where qualified homeowners were deliberately denied federal HAMP loan modifications.

[129] See http://www.bloomberg.com/data-visualization/federal-reserve-emergency-lending/#/overview/?sort=nomPeakValue&group=none&view=peak&position=0&comparelist=&search= for the trillions in Federal Reserve Emergency Funds given to financial firms, including Defendants Goldman Sachs and Bank of America, in the wake of the financial crisis of 2008

[130] See http://projects.propublica.org/bailout/list for list of TARP fund recipients.

*amount due on the referenced loan..."* **(SEE EXHIBIT – T)**, thus, demonstrating Litton's unwarranted and fraudulent changing of the monthly mortgage amount due.

70. In July 2010, despite making consecutive mortgage payments since October 2009, and Litton's empty promises of a loan modification, Litton continued to accept some payments from the complainant while rejecting others, hence, failing to credit her account which resulted in Litton sending pre-recorded foreclosure threats to Frances Rogers' telephone saying that she was late on her mortgage payment[131]. Consequently, in a letter dated July 8, 2010 **(SEE EXHIBITS – M & 1S)** from Litton sent through the US Postal Service, addressed to her deceased husband Thomas Rogers, not the complainant,[132] Litton again threatened the complainant with foreclosure actions. Hence the letter reads in part...

> *"Our records indicate that you have fallen behind on your mortgage payments. Foreclosure action on your home may begin soon or may already be in progress..."*[133]

71. Overwhelmed by the emotional stress caused by the negligent actions of Litton and constantly reliving the death of her husband for Litton refused to acknowledge the complainant as the property owner, the complainant demanded that all communication sent from the Defendants be handled by her attorneys, Mattleman, Weinroth & Miller,

---

[131]See **EXHIBITS –2E, N, M** for the manipulated "credit event" upon the complainant's property, triggered by the tactics used by the Goldman and substantiated by May 2011's whistleblower allegations by a Litton Loan Servicing LP employee to the Federal Reserve Bank of NY, detailing a denial sweep program where qualified homeowners were deliberately denied federal HAMP loan modifications, http://www.housingwire.com/news/litton-loan-whistle-blower-letter-given-ny-fed. Also See https://fisher.osu.edu/blogs/efa2011/files/REF_2_2.pdf and **EXHIBIT – 2G** for 2011's report *"The Bear's Lear: Index Credit Default Swaps and the Subprime Mortgage Crisis"* (Page 14) for Goldman's CDS referencing GSAMP Trust 2007 – NC1, to which the complainant's New Jersey property was pooled.

[132] Litton knew of the passing of the late Thomas Rogers via **EXHIBIT – G** for over a year and acknowledge the fact as evident in **EXHIBIT – N.**

[133] **IMPORTANT FACTS ABOUT CDS:** Under standard Credit Default Swaps contracts designed by the International Swaps and 1552 Derivatives Association (ISDA), a credit event is defined as a (1) bankruptcy; (2) failure to pay; (3) restructuring; (4) repudiation of or moratorium on payment in the event of an authorized government intervention; or (5) an acceleration of an obligation. Another common credit event is incurring a credit rating loss. Therefore, once the complainant's mortgage was fraudulently deemed by Litton in default for failure to pay, the holder of CDS' were compensated.

P.C. As a result, her attorney, Malcolm Block, addressed Litton by letter dated July 22, 2010 **(SEE EXHIBIT – 1B)** again tackling the issue of the complainant's ownership, for Litton once again requested Frances Rogers send in a Deed of Ownership, documentation that was provided numerous times[134] since the summer of 2009 upon the death of her husband Thomas Rogers, confirmed as received multiple times thereafter **(SEE EXHIBITS - C, H, J, 1B, 1H)** by the complainant, her attorneys, and employees of Litton, and documented on the very mortgage noted recorded with the Burlington County Clerk's office in December 2006 by New Century, displaying Frances Rogers as the borrower and owner.[135]

72. Shortly thereafter the aforementioned letter on July 22, 2010 **(SEE EXHIBITS – 1B)** in which the complainant's attorney Malcolm Block continued his effort to secure a loan modification to which Litton reneged in October 2009 **(SEE EXHIBIT – H)** and received $76.3 Million of TARP funds in August 2009[136] as an incentive payment to grant federal HAMP loan modifications to qualified homeowners such as the complainant and her late husband, Frances Rogers was served with a motion to foreclose on her New Jersey residential property, dated July 20, 2010 **(SEE EXHIBIT – Y)**, sent through the U.S. Postal Service from attorneys Rosemarie Diamond, Vladimir Palma, Brian J. Yoder, Brian Blake, Thomas M. Brodowski, Sharon L. McMahon of Phelan Hallinan & Schmieg, PC, on behalf of *"BANK OF AMERICA, NATIONAL ASSOCIATION AS SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION[137], AS*

---

[134] See http://www.huffingtonpost.com/joel-sucher/goldman-sachs-and-litton-_b_2144452.html for the account of an Ex- Litton executive detailing direct orders from Goldman in 2009 to deny loan modification s to homeowners despite their qualifications in pursuit of foreclosure. Also see http://www.housingwire.com/news/litton-loan-whistle-blower-letter-given-ny-fed for May 2011's whistleblower allegations by a Litton Loan Servicing LP employee to the Federal Reserve Bank of NY, detailing a denial sweep program where qualified homeowners were deliberately denied federal HAMP loan modifications.

[135] See **EXHIBIT - 2C** for Litton upon the death of Thomas Rogers in June of 2009 to late 2010, questioned Frances Rogers' ownership rights in the property despite knowing she was the owner as evident within the mortgage recording with the Burlington County Clerk's office on December 12, 2006.

[136] See http://projects.propublica.org/bailout/list for list of TARP fund recipients.

[137] See http://www.bizjournals.com/columbus/stories/2007/10/01/daily1.html for Bank of America's purchase of LaSalle in October 2007.

*TRUSTEE UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF FEBRUARY 1, 2007, GSAMP TRUST 2007 – NC1 VS. THOMAS U. ROGERS, et al."* The letter in part reads,

> *"Enclosed herewith is a copy of the Notice of Motion for Entry of Default, relative to the above foreclosure action. This is an attempt to collect a debt and any information obtained will be used for that purpose."*

73. Hence, one year prior to the July 2010 foreclosure motion from Phelan Hallinan & Schmieg, PC on behalf of Bank of America (hereby referred to as BOA) and GSAMP Trust 2007 – NC1, Judith T. Romano[138], an employee of Phelan Hallinan & Schmieg, PC, signing as the *"Assistant Secretary and Vice President"* of MERS, executed a fraudulent assignment to GSAMP Trust 2007 – NC1 on June 19, 2009 **(SEE EXHIBIT – 2D)**. What followed was a fraudulent Foreclosure Complaint on June 30, 2009 (the same day Thomas Rogers died) filed with the Office of the Clerk of the Superior Court of New Jersey **(SEE EXHIBIT – 2E)** by attorneys Rosemarie Diamond and Vladimir Palma of the PHS firm working on behalf of the trust, despite not filing the assignment with the Burlington County Clerk's office until July 29, 2009 **(SEE EXHIBIT – 2D)**. Thus, in a letter dated August 27, 2009 **(SEE EXHIBIT – N)** from Litton sent via the U.S. Postal Service addressed to the late Thomas Rogers, not the complainant, reads in closing… *"The loan has been referred for foreclosure proceedings. To request a reinstatement or payoff amount, please contact Phelan, Hallinan & Schmieg, LLP at (856) 813-5500 or at the following address:",* confirming Phelan, Hallinan & Schmieg, LLP (hereby referred to as PHS) as the firm executing the foreclosure action for Litton and GSAMP Trust 2007

---

[138] See http://www.lsnj.org/NewsAnnouncements/Foreclosure/materials/LSNJReport.pdf for *"Legal Services of New Jersey Report and Recommendation to the New Jersey Supreme Court Concerning False Statements And Swearing In Foreclosure Proceedings November 4, 2010."* As a result of the non-assignment of the complainant's NJ property to GSAMP Trust 2007 – NC1 by the February 1, 2007 cut-off per the prospectus seen at http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf (S-63), Judith T. Romano, an employee of Phelan Hallinan & Schmieg, PC executed a fraudulent assignment to the trust dated June 19, 2007, signing as the "Assistant Secretary and Vice President" of MERS, as seen in **EXHIBIT – 2D**.

– NC1 in August 2009 **(SEE EXHIBIT – N)** as they were doing a year later for BOA, as trustee of GSAMP Trust 2007 – NC1, in July 2010.

74. Thus, despite the false promises of a loan modification by the mortgage servicer Litton, accepting and cashing mortgage payments from the complainant in which some they credited to her account and others were not, unjustly changing the monthly mortgage payment due, and BOA having no standing to foreclose as required by law in New Jersey[139](especially in light of the fraudulent assignment in June 2009), the complainant's New Jersey residential property was now being sought for foreclosure by GSAMP Trust 2007 – NC1 and BOA as the trustee using the PHS firm.

75. Confused and on the brink of an emotional breakdown, Frances Rogers sought the advice of her attorneys who then proceeded to help her challenge the motion to foreclose by BOA for GSAMP Trust 2007 – NC1 and their legal representatives PHS, who only a year prior, were introduced to the complainant by Litton as the firm executing their foreclosure pursuit in August 2009 **(SEE EXHIBIT – N)**.  As a result, in a letter dated July 30, 2010, **(SEE EXHIBIT – Z)** addressed to the Office of Foreclosure, P.O. Box 971, 25 Market Street, Trenton, New Jersey 08625, and copied on the letter was the Defendant PHS, the complainant said in part:

> *"1. My loan is with Litton Loan Servicing.  I applied for a loan modification with Litton on 8/09."*

> *"2. On 10/1/09 I received a Home Affordable Trial Plan Modification ("Trial Plan")....*

---

[139] Under New Jersey law, a party seeking to foreclose a mortgage must own or control the underlying debt. *Bank of New York v. Raftogianis, 2010 N.J. Super. LEXIS 221, (Ch. Div. 2010).* Without a showing of such ownership or control, a purported mortgagee lacks standing to proceed with a foreclosure action, and a complaint must be dismissed.  To establish standing to maintain a foreclosure action, a plaintiff must have ownership or control of the underlying debt as of the date of the filing of the complaint.  Under Rule 4:64-1(b)(10),when a foreclosure plaintiff is not the original mortgagee or the original nominee mortgagee, a complaint must recite "all assignments in the chain of title."  None of this essential information was provided by the Phelan firm or Bank of America to justify their improper foreclosure action against the Estate of Thomas Rogers and Frances Rogers.

"3. I have made all of my trial plan payments and all subsequent monthly payments through 7/2010. My July payments was wrongfully returned to me based on an incorrect and inaccurate letter sent to me by Litton on 7/8/10......

"4. Litton is now again threatening me with foreclosure and entry of a default because I did not file an answer or otherwise appear in the foreclosure action. This is not true....

"5. On 7/15/10 Litton advised that if I submitted two documents (copy of my Deed and an authorization agreement) they would proceed with the permanent modification request..."

"6. I further object to the entry of a default based on the fact that since I am making all of my monthly payments as agreed and accepted by Litton under the original trial plan....

76. Despite a detailed explanation by the complainant sent to PHS and Litton, shedding light on the fact that she owed nothing to BOA for her dealings as it pertained to her property were with Litton, whom continued to accept her monthly mortgage payments and danced around their promised of a loan modification to the complainant and her counsel, PHS continued its motion to fraudulently foreclose on behalf of the trustee of GSAMP Trust 2007 – NC1, BOA, despite the trustee having no standing to foreclose as required by law[140] due to the defective chain of title issue that PHS fraudulently[141] attempted to

---

[140] Under New Jersey law, a party seeking to foreclose a mortgage must own or control the underlying debt. *Bank of New York v. Raftogianis, 2010 N.J. Super. LEXIS 221, (Ch. Div. 2010).* Without a showing of such ownership or control, a purported mortgagee lacks standing to proceed with a foreclosure action, and a complaint must be dismissed. To establish standing to maintain a foreclosure action, a plaintiff must have ownership or control of the underlying debt as of the date of the filing of the complaint. Under Rule 4:64-1(b)(10),when a foreclosure plaintiff is not the original mortgagee or the original nominee mortgagee, a complaint must recite "all assignments in the chain of title." None of this essential information was provided by the Phelan firm or Bank of America to justify their improper foreclosure action against the Estate of Thomas Rogers and Frances Rogers.

[141] See http://www.lsnj.org/NewsAnnouncements/Foreclosure/materials/LSNJReport.pdf for *"Legal Services of New Jersey Report and Recommendation to the New Jersey Supreme Court Concerning False Statements And*

correct in the summer of 2009 as seen in **EXHIBITS 2C, 2D, & 2E**.  Thus, on August 24, 2010, attorney Brian Yoder of PHS responded to the complainant's contestation of foreclosure by BOA through the U.S. Postal Service by stating....

> *"We are in receipt of your Answer to the foreclosure complaint dated August 2, 2010, in regards to the above referenced matter.  Please be advised that our office has confirmed with the Office of Foreclosure that an answer has not been filed as of August 24, 2010.  Consequently, please accept this letter as confirmation that we will be proceeding with the foreclosure as an uncontested matter."* **(SEE EXHIBIT – 1A)**

77. Only three days after the aforementioned letter dated August 24, 2010 sent from PHS **(SEE EXHIBIT – 1A)** to Frances Rogers indicating their intent to continue their pursuit of foreclosure on the complainant's New Jersey residential property on behalf of their client BOA and GSAMP Trust 2007 – NC1, PHS sent a letter dated August 27, 2010 through the U.S. Postal Service to Frances Rogers demanding that she now pay monies to their client Litton or face foreclosure.  Hence, **EXHIBIT – 1Z** reads in part...

> *"This letter is in response to your request for a payoff amount.  As of August 27, 2010 the payoff amount owed is $211,791.87...* ***Please be advised that the payoff amount is subject to final verification by the Noteholder...*** *There may be other options available to help you avoid foreclosure.  You may contact your lender to discuss these options... Please make your attorney trust check, title company check, certified check, bank check or money order payable to Litton Loan and mail or deliver the check directly to Phelan Hallinan & Schmieg, P.C., 400 Fellowship Road, Suite 100, Mt. Laurel, NJ 08054, so that we receive it no later then 5:00 PM on 9/8/10..."*

---

Swearing In Foreclosure Proceedings November 4, 2010."  As a result of the non-assignment of the complainant's NJ property to GSAMP Trust 2007 – NC1 by the February 1, 2007 cut-off per the prospectus seen at http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf (S-63), Judith T. Romano, an employee of Phelan Hallinan & Schmieg, PC executed a fraudulent assignment to the trust dated June 19, 2007, signing as the "Assistant Secretary and Vice President" of MERS, as seen in **EXHIBIT – 2D**.

**78.** Thus, PHS falsely declared Litton as the "*Noteholder*" and the "*lender*" despite BOA being the proclaimed "Noteholder" and Litton the "servicer" per GSAMP Trust 2007 – NC1[142], and a "debt collector" per Litton's own declaration.[143]   Furthermore, PHS' employee Judith T. Romano[144], fraudulently signed as the "*Assistant Secretary and Vice President*" of MERS and executed a fraudulent assignment of the complainant's property to the trust on June 19, 2009.  The fraudulent assignment was followed by a foreclosure complaint filed by PHS for GSAMP Trust 2007 – NC1 on June 30, 2009 (the same day Thomas Rogers died) with the New Jersey Superior Court, despite the fraudulent assignment on June 19, 2009 not being received by the Burlington County Clerk's office until July 29, 2009 **(SEE EXHIBIT – 2D)**.  Nevertheless, in the summer of 2010, BOA did not foreclose on the complainant's property.  Litton, however, continued its threats of foreclosure on the property of Frances Rogers and their denial of a federal HAMP loan modification, as they promised and consistently reneged, despite the complainant constantly demonstrating her exceeding qualifications[145].

**79.** In the summer of 2010, the complainant hired Metro Public Adjusters to help her file a claim for covered damages to her residential property.  In return, her homeowner insurance carrier Lloyds of London approved the claim and sent a check to the complainant.  Upon the instructions given to the complainant by Metro Public Adjusters, Frances Rogers signed the check which was then forwarded to Litton.  In a letter dated

---

[142] See http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf and http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf for more information about the Pooling and Servicing Agreement of February 1, 2007 that created GSAMP TRUST 2007 – NC1

[143] See **EXHIBIT – M** for letter from Litton declaring themselves a "*debt collector*" not a "*lender*" or "*noteholder*".

[144] See http://www.lsnj.org/NewsAnnouncements/Foreclosure/materials/LSNJReport.pdf for "*Legal Services of New Jersey Report and Recommendation to the New Jersey Supreme Court Concerning False Statements And Swearing In Foreclosure Proceedings November 4, 2010.*"  As a result of the non-assignment of the complainant's NJ property to GSAMP Trust 2007 – NC1 by the February 1, 2007 cut-off per the prospectus seen at http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf (S-63), Judith T. Romano, an employee of Phelan Hallinan & Schmieg, PC executed a fraudulent assignment to the trust dated June 19, 2007, signing as the "Assistant Secretary and Vice President" of MERS, as seen in **EXHIBIT – 2D**.

[145] See http://www.makinghomeaffordable.gov/programs/lower-payments/Pages/hamp.aspx for details about the Federal Home Affordable Modification Program.

August 27, 2010 **(SEE EXHIBIT – S)**, sent via the U.S. Postal Service, Litton addressed *"Thomas Rogers (Deceased)"*, not the complainant who was the only insured listed on the homeowners policy, indicating all that was required from the complainant in order to release the insurance claim check in the amount of $4,702.01, and she followed all of Litton's requirements, one of which included selecting a license contractor. Litton, however, did not approve of the contractor selected for reasons unexplained to the complainant and, as a result, refused to release the insurance claim check made payable to Frances Rogers, the insured and premium payor of the homeowner policy with Lloyds of London. Thus, records later retrieved through an email dated January 28, 2012 directly from the insurance broker of Lloyds of London, revealed that Litton cashed the complainant's insurance claim check on September 1, 2010 and withheld the proceeds **(SEE EXHIBIT – W)**. Hence, this action constituted theft, fraud, extortion, and gross negligence for the check was made payable in the name of the insured and premium payor, Frances Rogers.

**80.** In November 2010[146], grieving the loss of her beloved husband Thomas Rogers, whose last days on earth together with his wife consisted of warding off the unjust and fraudulent foreclosure pursuit of Litton and GSAMP Trust 2007 – NC1, the constant threat of foreclosure after her husband's death from Litton, BOA, PHS and GSAMP Trust 2007 – NC1, along with Litton's constant denial of a federal HAMP loan modification to the complainant,[147] cashing of her mortgage payments without crediting her account, unwarranted changes of the monthly mortgage payment due, and denying the complainant's ownership rights in her property, Frances Rogers, on the verge of an

---

[146] See http://www.lsnj.org/NewsAnnouncements/Foreclosure/materials/LSNJReport.pdf for *"Legal Services of New Jersey Report and Recommendation to the New Jersey Supreme Court Concerning False Statements And Swearing In Foreclosure Proceedings November 4, 2010."* As a result of the non-assignment of the complainant's NJ property to GSAMP Trust 2007 – NC1 by the February 1, 2007 cut-off per the prospectus seen at http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf (S-63), Judith T. Romano, an employee of Phelan Hallinan & Schmieg, PC executed a fraudulent assignment to the trust dated June 19, 2007, signing as the "Assistant Secretary and Vice President" of MERS, as seen in **EXHIBIT – 2D**.

[147] See https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_32.pdf for the HAMP Handbook for Servicers of Non-GSE Mortgages, where the U.S. Treasury requires mortgage servicers to *actively* solicit borrowers to participate in HAMP *before* referring a loan to foreclosure or conducting a scheduled foreclosure sale.

emotional, psychological, and physical break down, decided to enter a short sale agreement with Litton, and vacated her Willingboro, New Jersey home to seek refuge with her daughter, a U.S. Army veteran living in the state of Texas.

81. In August 2011, the complainant again inquired about the whereabouts of the insurance claim check from August 2010 that she had yet to receive from Litton. As a result, Litton requested that Frances Rogers find a contractor and promised to forward her $1,000 of her $4,702.01 claim check in order for the contractor to begin the work (**SEE EXHIBIT – U**). Hence, the complainant found a contractor and received a check dated August 16, 2011, addressed to the contractor and *"Thomas Rogers (DECEASED)"* (**SEE EXHIBIT - V**).

82. Enraged by the constant reliving of her husbands' death due to Litton's continued disrespect, fraud, extortion, and negligence all of which is evident within Litton's consistent non-acknowledge of Frances Rogers as the property owner, instead, addressing her late husband who died 2 years prior (**SEE EXHIBIT – 1H** for Frances Rogers' diary notes detailing her account of Litton Loan during this time period), the complainant demanded Litton reissue another check with only her and the contractors' name attached. A serious of heated exchanges ensued between Litton and the complainant for the accused, initially, continued its refusal to replace the complainant's name as the payee instead of *"Thomas Rogers (DECEASED)"* (**SEE EXHIBIT – 1H** for Frances Rogers' diary notes detailing her account of Litton during this time period). Nevertheless, Litton finally agreed to replace *"Thomas Rogers (DECEASED)"* with Frances Rogers as the payee, only this time sending her a check in both her and the contractors' name and the wrong address printed on the check.[148] Now September 2011, the complainant again returned the $1,000 check to Litton, demanding another check with the correct address be reissued (**SEE EXHIBIT – V**).

---

[148] **SEE EXHIBIT – 1H** for Frances Rogers' diary detailing the pain that she and late husband Thomas Rogers suffered at the hands of Litton and leaving her heirs a written account of the facts as it pertains to the accused, in case she succumbed to the pain and suffering caused by Litton.

83. Consequently, with the sale of Litton to Ocwen Financial Corporation (hereby referred to as Ocwen) in September of 2011,[149] the complainant was unable to get a hold of anyone from Litton due to the "slowing down" of their operations and eventual integration into Ocwen. Simultaneously, Ocwen sent the first of four letters to the complainant's New Jersey residential property through the U.S. Postal Service, addressed to *"ESTATE OF THOMAS ROGERS"*, not Frances Rogers, dated September 6, 2011 **(SEE EXHIBIT – 2A)**. The letter reads in part… *"Ocwen Loan Servicing, LLC is the servicer of the above referenced loan (hereinafter referred to as "the Debt" for ("Creditor") GSAMP TRUST 2007 – NC1… Principal … $190,699.71 … Total Due … $232,779.39…"* The very next correspondence sent from Ocwen via the U.S. Postal Service to the complainant is dated October 17, 2011 and reads in part…*"Current Principal Balance:"* of $190,699.71, an *"Interest Rate: 7.05000%... Next Payment Due Date: 10/01/2009… Total Amount Due: $51,245.01…"*[150] **(SEE EXHIBIT – 1Y)**.

84. Thus, in March 2011, prior to Ocwen owning Litton, the Federal Trade Commission announced its investigation of Ocwen relating to the company's home loan servicing and foreclosure activities.[151] Despite the investigation from the FTC, prior lawsuits and sanctions ruled against Ocwen for fraudulent mortgage related activities[152], Ocwen's

---

[149] See http://www.huffingtonpost.com/2011/09/01/goldman-sells-litton-mortgage-unit_n_945835.html for Goldman Sachs' September 2011 sell of Litton Loan Servicing LP, approximately $41.2 Billion in mortgages, to Ocwen Financial Corporation for $264 Million, with 2 reprimands from Regulators for Litton's illegal foreclosure tactics during 2009 – 2010.

[150] See http://mortgage-home-loan-bank-fraud.com/legal/Guzman%20v%20Ocwen.pdf for Guzman v. Ocwen, a lawsuit filed by a homeowner out of Texas where employees of the Defendant testified to the firms practice of creating numbers out of thin air to illegally foreclose.

[151] See http://www.palmbeachpost.com/news/news/real-estate/ocwen-targeted-by-ftc-for-scrutiny/nLqjN/ for the FTC's March 2011 investigation into the fraudulent foreclosure and servicing activities of Ocwen. Also in March 2011, Goldman declares it wants to sell Litton, http://www.businessinsider.com/goldman-sachs-sell-litton-loan-servicing-foreclosures-2011-3 . Thus, the sale of Litton to Ocwen was finalized in September 2011, http://www.huffingtonpost.com/2011/09/01/goldman-sells-litton-mortgage-unit_n_945835.html .

[152] See http://mortgage-home-loan-bank-fraud.com/articles/Davis-v-Ocwen.html for *Davis vs. Ocwen* See http://mortgage-home-loan-bank-fraud.com/legal/Guzman%20v%20Ocwen.pdf for *Guzman vs. Ocwen Federal Bank*, See http://files.ots.treas.gov/93606.pdf for Ocwen's 2005 written agreement with the OTS, resulting from enforcement actions against Ocwen in 2004. Also see http://www.courts.ca.gov/opinions/documents/B229112.PDF for 2012 court ruling from CA in favor of homeowner against Ocwen for the firms' fraudulent mortgage related activities.

appetite for fraudulent mortgage related activities has not been deterred as evident in their actions towards the complainant upon immediately acquiring Litton in September 2011 **(SEE EXHIBITS – 1E, 1D, 1F, 1Y, 2A, & 2B).**

85. In December of 2011, the complainant was finally able to get in contact with Ocwen via telephone and was denied by their employees any information for Ocwen would not acknowledge her as the owner of the subject property. Thus, Ocwen demanded by telephone the same proof of ownership that was established over the last two years by the complainant with Litton, recorded at the county clerk's office and possessed by Ocwen, be re-established with the firm.[153] Over the next two months the complainant pestered Ocwen via telephone calls, disregarding their request that she prove her ownership of the subject property, for that right existed ever since the late Thomas Rogers and his wife Frances Rogers purchased the property in November 1999, December 2006's recording of the mortgage by New Century displaying Thomas and Frances Rogers **(SEE EXHIBIT – 2C)**, and Litton's files for they repeatedly demanded the complainant prove her ownership of the property despite the obvious. Furthermore, Frances Rogers inquired about the outstanding insurance claim check from August 2010 that had yet to be paid to her despite being cashed by Litton in September 2010 **(SEE EXHIBIT – W).**

86. From November 2011 to February 2012, despite Ocwen possessing the files of the complainant's former mortgage servicer Litton, Frances Rogers spent months battling with Ocwen by telephone regarding their refusal to acknowledge her as the homeowner and turning over her insurance claim check yet to be paid by Litton despite confirmed by Lloyds of London, cashed by Litton on September 1, 2010 **(SEE EXHIBIT – W)**. Thus, in February 2012, Ocwen finally agreed with the complainant over the telephone to turn over the monies owed from her insurance claim check from the summer of 2010, minus $1,000, made payable to only her and the contractor together. Hence, Ocwen refused to issue the full insurance claim check in the amount of $4,702.01, already confirmed by the

---

[153] See **EXHIBIT - 2C** for Litton upon the death of Thomas Rogers in June of 2009 to late 2010, questioned Frances Rogers' ownership rights in the property despite knowing she was the owner as evident within the mortgage recording with the Burlington County Clerk's office on December 12, 2006. With the acquisition of Litton in September 2011, Ocwen continued to deny Frances Rogers ownership rights.

issuer Lloyds of London cashed by Litton on September 1, 2010 **(SEE EXHIBIT – W)**, and instead paid $3,702.01 to the contractor and complainant in February 2012 **(SEE EXHIBIT – 1D)** for according to Ocwen's records, Litton had already paid $1,000 to complainant, which is a lie.[154]

87. In March 2012, the complainant's contractor informed her in confidence that Litton sent to the contractor through the US Postal Service a 2011 W9 stating $4,351.00 paid to the contractor in the year 2011 **(SEE EXHIBIT – X)**. This document submitted to both the contractor and IRS is totally false for Ocwen, the owner of Litton since September 2011, paid the contractor $3,702.01 in February 2012 **(SEE EXHIBIT – 1D)**, with $1,000 still outstanding to date. Furthermore, as the owner of Litton since September 2011, Ocwen is responsible for the false 2011 W9 tax return from Litton.[155] Though not a claim to which the complainant seeks relief, Ocwen's willingness to defraud the IRS displays their propensity to commit fraud on a homeowner such as they did with the complainant Frances Rogers.

88. Thus, Litton was obligated to turn over the proceeds from the insurance claim to the payee, insured, and premium payor, the complainant Frances Rogers, and did not despite confirmation from a broker of Lloyds of London (the insurer) in January 2012 that Litton cashed and cleared the check 18 months prior on September 1, 2010 **(SEE EXHIBIT – W)**. Furthermore, Ocwen refused to turn over the total $4,702.01, for they stood by their

---

[154] See **EXHIBITS – V & 1H** for the 2010 insurance claim made payable by Lloyds of London payable to Frances Rogers (insured), referencing Metro Public Adjuster hired by the complainant, and Litton. Upon the check being forwarded to Litton by Ocwen per the servicer's demand, Litton chased the check on 9/01/2009, and released the 1st check to the complainant in August 2011 for $1,000 made payable to the contractor and "Thomas Rogers (DECEASED)", sending the grieving widow into a depression to which she logged, and her demanding another check be reissued. Litton obliged sending the complainant a check made payable to her and the contractor, with the wrong address on the check. The complainant returned the check in September 2011, only to receive $4702.01 minus $1,000.00 in February 2012 from Litton's new owner as of September 2011, Ocwen.

[155] Although not a count that directly affected the complainant, as the aforementioned allegations have revealed, Defendant Ocwen violated 26 U.S.C. § 7206(1), 26 U.S.C. § 7212(a) (1988); IRS Fraud, showing their propensity and wiliness to commit fraud. Also see http://mortgage-home-loan-bank-fraud.com/legal/Guzman%20v%20Ocwen.pdf the lawsuit, *Guzman vs. Ocwen Federal Bank*, detailing the testimony of two employees of Ocwen stating the firm creates numbers out of thing air in order to foreclose on homeowners.

records indicating that Litton, owned by Ocwen since September 2011, had already paid $1,000 to the complainant, which has been substantiated by the documents provided by the complainant and her contractor as false **(SEE EXHIBITS – X & 1D)**. Lastly, Ocwen paid the complainant's contractor, $3,702.01 in February 2012 **(SEE EXHIBIT – 1D)** and Litton, owned by Ocwen since September 2011,  sent to both the complainant's contractor and the IRS[156], a falsified 2011 1099-MISC **(SEE EXHIBIT – X)**, indicating payment of $4,351.00 paid to the contractor.   To date, $1,000 from the original insurance claim check of $4,702.01, cashed and cleared by Litton on September 1, 2010, is unaccounted for.

89. The next letter sent by the U.S. Postal Service from Ocwen, dated June 6, 2012 **(SEE EXHIBIT – 1F),** and addressed to the *"Estate of Thomas Rogers"*, not the complainant, reads in part...

> *"The interest rate on your loan is scheduled to adjust on 7/1/2012.... Current interest rate: 7.05000%... New interest rate: 7.05000%.... Current P&I payment: $1,335.91... New P&I payment: $1,364.09... Escrow payment: $637.58... Total payment: $2,001.67.... The principal balance on your loan after the 7/1/2012 payment will be $190,699.71... Your new interest rate is calculated by adding the margin to the new index value, as defined in your mortgage documents.   The result of this addition is subject to rounding and rate cap limitations according to the terms of your mortgage documents... This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose.  However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt."[157]*

---

[156] Although not a count that directly affected the complainant, as the aforementioned allegations have revealed, Defendant Ocwen violated 26 U.S.C. § 7206(1), 26 U.S.C. § 7212(a) (1988); IRS Fraud, showing their propensity and wiliness to commit fraud.

[157] Also see http://mortgage-home-loan-bank-fraud.com/legal/Guzman%20v%20Ocwen.pdf for Guzman v. Ocwen, a lawsuit filed by a homeowner out of Texas where to employees of the Defendant testified to the firms practice of creating numbers out of thin air to illegally foreclose.

**90.** Thus, the interest rate of 7.05% declared by Ocwen in the letters dated October 17, 2011 **(SEE EXHIBIT – 1Y)** and June 6, 2012 **(SEE EXHIBIT – 1F)** sent via the U.S. Postal Service to the complainant are false for the starting ARM interest rate upon the November 2006 refinance between the Rogers and New Century **(SEE EXHIBIT – 2C)**. In addition, the aforementioned rate increased twice from the origination of the ARM in November 2006 to February 2009, and the adjustable rate was never decreased by Litton for they never granted the Rogers a loan modification for which they qualified.  Lastly, the "*Total Amount Due:*" of $51,245.01 referenced in the October 17, 2011 letter sent via the U.S. Postal Service from Ocwen **(SEE EXHIBIT – 1Y)** is different from the first correspondence sent by the Defendant through the U.S. Postal Service in September 2011 **(SEE EXHIBIT – 2A)**, and these figures were not mentioned at all in the next correspondence from Ocwen's letter dated June 6, 2012 **(SEE EXHIBIT – 1F)**, thus, totally vanishing.  As of November 26, 2012 the next and last of four correspondences sent from Ocwen using the U.S. Postal Service to the complainant since acquiring Litton in September 2011, is a document dated September 26, 2012 with no mention of any mortgage balance / payment outstanding, only a request for personal information from "*the Estate of Thomas Rogers*", not Frances Rogers, the complainant, and owner of the subject property **(SEE EXHIBIT – 2B)**.

**91.** Thus, per a Comparative Market Analysis from Trend MLS **(SEE EXHIBIT – 2I)** of the lowest priced properties sold throughout Willingboro, New Jersey in 2012, the two lowest sales prices occurred in December 2012 within the same subdivision as the complainant's property, yielding an average sales price of $38,333, the lowest price being $35,000.  Thus, the $190,800 mortgage balance upon the complainant's property located in Willingboro, New Jersey, originated by the defunct New Century in 2006, a balance declared payable to Ocwen, the servicer for GSAMP Trust 2007 – NC1, to which Bank of America is the Trustee, Wells Fargo Bank, N.A. is the master servicer and securities administrator, Deutsche Bank National Trust Company is the custodian, and MERS the nominee, is 545% more than the market value for the lowest selling comparable that sold in December 2012, and located in the same subdivision as the complaint's property. Hence, within in a seven year time frame from 1999 when the Rogers purchased their

first home, to the first of three subprime ARM refinances starting in 2002 and ending in 2006 with the defunct New Century, rendered a 226% increase in the appraised value of the complainant's property, contrary to the national average of 50%.[158]

## B. New Century Mortgage: "Close More University"

92. Despite knowing their true financial health, or lack thereof, Brad A. Morrice in his official capacity as CEO of the defunct New Century Mortgage, the second largest subprime lender in the United States of America as of 2006,[159] continued *"Close More University"*[160], originating thousands of subprime mortgages across the United States of America underlined by fraud, as they did on November 28, 2006 with the late Thomas Rogers and the complainant.[161]  Furthermore, possessing internal knowledge of their impending insolvency, the executives of New Century, including Defendant Brad A. Morrice, in his individual And Official Capacity as CEO and co-founder, entered into another[162] mortgage pooling and servicing agreement on February 1, 2007[163] with several

---

[158] See http://www.ncpa.org/pdfs/st335.pdf for the National Center for Policy Analysis' June 2011 report *"The Housing Crash and Smart Growth"*(Page 4).

[159] See http://www.bloomberg.com/apps/news?pid=newsarchive&refer=&sid=aY3mu1qdRq94

[160] See http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf for FCIC 2011 report for "Close More University."

[161] As declared in *Barnsdall Refining Corn. V. Birnam Wood Oil Co. 92 F 26 817*, the courts ruled that *"any false representation of material facts made with knowledge of falsity and with intent that it shall be acted on by another in entering into contract, and which is so acted upon, constitutes 'fraud,' and entitles party deceived to avoid contract or recover damages."* Furthermore, in *Whipp v. Iverson, 43 Wis 2d 166*, the court declared *"It is not necessary for recision of a contract that the party making the misrepresentation should have known that it was false, but recovery is allowed even though misrepresentation is innocently made, because it would be unjust to allow one who made false representations, even innocently, to retain the fruits of a bargain induced by such representations."* Furthermore is the ruling in *Menominee River Co. v. Augustus Spies L & C Co., 147 Wis 559. 572; 132 NW 1122*, declaring... *"If any part of the consideration for a promise be illegal, or if there are several considerations for an unserverable promise one of which is illegal, the promise, whether written or oral, is holly void, as it is impossible to say what part or which one of the considerations induce the promise."*

[162] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for April 2011's *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"*

[163] Six days after the creation of GSAMP Trust – NC1 on February 1, 2007, consisting of 9,800 New Century mortgages including the complainant's, the defunct originator announced it would be restating their 2006 earnings, unveiling the firms fraudulent undertaking s in 2006 and prior, all of which was later exposed.

entities, including Defendant Goldman and its subsidiaries GS Mortgage Securities Corp. (depositor), Goldman Sachs Mortgage Company (sponsor), and Avelo Mortgage, L.L.C. (servicer, at the time, owned by Goldman), Mortgage Electronic Registration System (nominee) Wells Fargo Bank, N.A. (master servicer and securities administrator), Deutsche Bank National Trust Company (custodian), and BOA (trustee as successor by merger to LaSalle Bank National Association as of Oct. 2007), thus, impacting 9,800 residential mortgages across the United States of America, including the complainant's property.[164] Per the February 1, 2007 cut-off date to transfer all 9,800 mortgages into GSAMP Trust 2007 – NC1 declared in the prospectus[165], NC Capital Corporation as the responsible party (parent company of New Century), Goldman as the depositor, and Deutsche Bank National Trust Company as the custodian, although declared so, did not transfer the complainant's property into the trust until a fraudulent assignment to the trust was executed by PHS attorney Judith T. Romano[166], signing as the "*Assistant Secretary and Vice President*" of MERS, the nominee, in June 2009 **(SEE EXHIBIT - 2D)**.

93. Once one of the nation's largest mortgage origination companies, New Century collapsed and filed for bankruptcy on April 2, 2007. Formed in 1996, New Century grew rapidly originating mortgages to homeowners even when the firm knew the borrower had little ability to pay. New Century also pressured appraisers to inflate the value[167] of many properties regardless of the actual value of the underlying property so the loans would be approved and funded. New Century's bankruptcy examiner report, which was issued in

---

[164] See http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf for more information about the Pooling and Servicing Agreement of February 1, 2007 that created GSAMP TRUST 2007 – NC1

[165] See http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-63, the prospectus for GSAMP Trust 2007 – NC1, cut of date February 1, 2007. Also see EXHIBITS – 2C & 2D for

[166] See http://www.lsnj.org/NewsAnnouncements/Foreclosure/materials/LSNJReport.pdf for *"Legal Services of New Jersey Report and Recommendation to the New Jersey Supreme Court Concerning False Statements And Swearing In Foreclosure Proceedings November 4, 2010."* As a result of the non-assignment of the complainant's NJ property to GSAMP Trust 2007 – NC1 by the February 1, 2007 cut-off per the prospectus seen at http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf (S-63), Judith T. Romano, an employee of Phelan Hallinan & Schmieg, PC executed a fraudulent assignment to the trust dated June 19, 2007, signing as the "Assistant Secretary and Vice President" of MERS, as seen in **EXHIBIT – 2D**.

[167] See **EXHIBITS – 2H, 2I, & 2J** for a Comparative Market Analysis of Willingboro, New Jersey from 2002 to December 2012.

February 2008, found "*serious loan quality issues at [New Century] beginning as early as 2004*" and numerous "*red flags*" relating to loan quality. As with many originators, New Century's loan production department was far more concerned with originating large quantities of loans than with ensuring their quality. When New Century's audit committee began identifying potential problems with its risk management systems, New Century's senior management failed to respond.[168]

94.   On February 29, 2008, after reviewing extensive documentary evidence and conducting over 100 interviews, court-appointed Bankruptcy Examiner Michael J. Missal issued a detailed report on the various deficiencies at New Century. These deficiencies included lax mortgage standards and a failure to follow its own underwriting guidelines. Among his findings, the Examiner reported:

> "*New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy .... The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century Loans in the aptly named 'Close More University.' Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels.*"[169]

95.   New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan. A senior officer of New Century warned in 2004 that the "*number one issue is exceptions to the guidelines.*" Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies[170]. "*New Century ... layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers.*" Certain senior managers at New Century in 2004 were told by a New Century employee that when

---

[168] See "New Century Financial: Lessons Learned," Mortgage Banking, October 2008.
[169] See http://www.ft.com/cms/s/0/df6f0bae-fbb3-11dc-8c3e-000077b07658.html#axzz2DUqCwu5x for report by bankruptcy court examiner regarding New Century Financial Corporation's troublesome financial state.

[170] See **EXHIBITS – 2H, 2I, & 2J** for a Comparative Market Analysis of Willingboro, New Jersey from 2002 to December 2012.

underwriting stated income loans, *"we are unable to actually determine the borrowers' ability to afford a loan."*

96. In 2004, the number and severity of the exceptions to underwriting standards employed by New Century to originate greater volume was described by one Senior Officer as the *"number one issue"* facing New Century. By 2004, New Century Senior Management became aware of spiking increases in Early Payment Default ("EPD") rates-where a borrower fails to make even the first several payments on a loan-suggesting that the loan should never have been originated in the first place. In every month following March 2006, the EPD rate exceeded 10%, reaching to as high as 14.95% by year end.

97. Up until 2005 New Century used a DOS-based underwriting system which, according to a New Century manager interviewed by the Bankruptcy Examiner, enabled employees to *"finagle anything."* The Bankruptcy Examiner's investigation revealed that New Century's primary standard for loan quality was, contrary to its representations in the offering documents detailed to investors through prospectus for RMBS, whether the loan could be sold in the secondary market to investors, not whether a borrower could meet the obligations under the terms of the loan. As described in the Bankruptcy Examiner's Report, in New Century's wholesale division-which accounted for the vast majority (approximately 85%) of New Century's loan originations-the regional managers who had lending authority could override the internal appraiser's decisions. Moreover, the regional managers' compensation was not tied to loan quality, but was rather based on the volume of loans originated, providing incentive to inflate appraisal values in order to increase origination of New Century loans.[171]

98. A 2005 internal audit disclosed in the Bankruptcy Examiner's Report revealed that 18 of 77 (or 23%) of the loans reviewed at one New Century Sacramento fulfillment center had *"exceptions with either the appraisal conducted or the review of the appraisal submitted with broker-provided loans or the review appraisal conducted by New Century's Appraisal Department."* Similarly, the late Thomas Rogers' refinance with New Century

---

[171] See **EXHIBITS – 2H, 2I, & 2J** for a Comparative Market Analysis of Willingboro, New Jersey from 2002 to December 2012.

in November 2006 was a broker-provided loan with a questionable appraisal[172].  The results of the audit were not an anomaly. According to the Bankruptcy Examiner, the results of New Century's own loan quality audits of underwriting procedures, account manager review/approval, appraisals and funding "*were dismal.*" As reported by the Bankruptcy Examiner, of nine branches audited by New Century in 2005, none were rated satisfactory, seven were rated unsatisfactory and two were rated as needs improvement.

99. The Bankruptcy Examiner's Report determined that New Century's representations that it "*designed its underwriting standards and quality assurance standards to make sure that loan quality was consistent and met its guidelines*" were "*not supportable.*" Indeed, New Century's statements regarding its "*improved underwriting controls and appraisal review process*" have been held by federal courts to be false or misleading statements of material fact. New Century's Loan Production Department was the dominant force within the company and mortgage brokers were trained to originate loans in a department which came to be known as "*Close More University.*"  Loan originations rose dramatically at New Century, from approximately $14 billion in 2002 to approximately $60 billion in 2006.  According to the Bankruptcy Examiner's Report, New Century's Chief Credit Officer said that in 2004 New Century had "*no standard for loan quality.*"

100.     The Bankruptcy Examiner highlighted the severity of New Century's improper conduct[173]:

> "*The Examiner recognizes that the subprime mortgage market collapsed with great speed and unprecedented severity, resulting in all of the largest subprime lenders either ceasing operations or being absorbed by larger financial institutions. Taking these events into consideration and attempting to avoid inappropriate hindsight, the Examiner concludes that New Century engaged in a*

---

[172] See **EXHIBITS – 2H, 2I, & 2J** for a Comparative Market Analysis of Willingboro, New Jersey from 2002 to December 2012.

[173] See http://www.ft.com/cms/s/0/df6f0bae-fbb3-11dc-8c3e-000077b07658.html#axzz2DUqCwu5x for report by bankruptcy court examiner regarding New Century Financial Corporation's troublesome financial state.

*number of significant improper and imprudent practices related to its loan originations, operations, accounting and financial reporting processes."*

101.    These findings demonstrate that representations in the GSAMP Trust 2007 – NC1 Prospectus supplement touting New Century's underwriting standards were false. Among other misrepresentations, New Century did not issue mortgages based on a good faith assessment of *"the borrower's ability to repay the mortgage loans," "the value of the mortgaged property,"* and the *"adequacy of the property as collateral for the mortgage loan."* New Century did not make *"case by case exceptions"* to its underwriting guidelines based on *"compensating factors"* and it did not ensure that mortgage properties which secured its loans were *"appraised by qualified independent appraisers."*

102.    Instead, as the Bankruptcy Examiner found, New Century had engaged in a number of harmful mortgage practices, including *"increasing loan originations, without due regard to the risks associated with that business strategy"; risk layering in which it issued high risk loans to high risk borrowers, including originating in excess of 40% of its loans on a stated income basis; allowing multiple exceptions to underwriting standards; and utilizing poor risk management practices that relied on the company's selling or securitizing its high risk mortgages rather than retaining them."*[174]

103.    On December 7, 2009, the SEC charged three of New Century's top officers with violations of the federal securities laws, and claimed that *"New Century's business was anything but 'good' and it soon became evident that its lending practices, far from being 'responsible,' were the recipe for financial disaster."* The SEC Complaint further details the falsity of New Century's assurances to the market about its *"adhere[nce] to high origination standards in order to sell [its] loan products in the secondary market,"* and its policy to *"only approve subprime loan applications that evidence a borrower's ability to repay the loan."* Claims asserted against New Century for making false or misleading statements of material fact regarding New Century's purported prudent underwriting

[174] See http://www.levin.senate.gov/imo/media/doc/supporting/2011/PSI_WallStreetCrisis_041311.pdf for findings, including emails, witness testimonies, data filed with Regulatory bodies including the SEC, complied by the U.S. Subcommittee's United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs, titled *"WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse"* of April 2011.

guidelines have already been sustained under Section IO(b) and Rule 10b-5 of the
Securities Exchange Act of 1934, and Section 11 of the Securities Act of 1933.[175]

104.       Patricia Lindsay, a former Vice President of Corporate Risk at New Century,
testified before the FCIC in April 2010[176] that, beginning in 2004, underwriting
guidelines had been all but abandoned at New Century. Lindsay further testified that New
Century systematically approved loans with 100 percent financing to borrowers with
extremely low credit scores and no supporting proof of income. According to Lindsay,
appraisers *"fear[ed]" for their "livelihoods"* if they failed to provide New Century with a
lofty valuation of their collateralized property. As a result, New Century's *appraisers
"would find properties that would help support the needed value rather than finding the
best comparables to come up with the most accurate value."*

105.       In 2008, the OCC identified New Century as the worst subprime lender in the
country[177] based on the delinquency rates of the mortgages it originated in the ten
metropolitan areas between 2005 and 2007 with the highest rates of delinquency. Further,
the FCIC Report singled out New Century[178]:

> New Century - once the nation's second-largest subprime lender-ignored early
> warnings that its own loan quality was deteriorating and stripped power from two
> risk-control departments that had noted the evidence. In a June 2004 presentation,
> the Quality Assurance staff reported they had found severe underwriting errors,
> including evidence of predatory lending, federal and state violations, and credit
> issues, in 25% of the loans they audited in November and December 2003. In

---

[175] See http://www.sec.gov/litigation/complaints/2009/comp21327.pdf for *Securities and Exchange Commission v.
Brad A. Morrice et al., Civil Action No. CV 09-01426 DDP (C.D. Cal.)*, settled in July 2010.

[176] See Written Testimony of Patricia Lindsay, former Vice President of Corporate Risk at New Century, before the
FCIC Hearing, April 7, 2010, http://fcic-static.law.stanford.edu/cdn-media/fcic.testimony/2010-0407-Lindsay.pdf, at
3, regarding fraudulent appraisals and other negligent underwriting tactics used by New Century.

[177] See "Worst Ten in the Worst Ten," Office of the Comptroller of the Currency Press Release (Nov. 13, 2008),
*available at* http://www.occ.treas.gov/news-issuances/news-releases/2009/nr-occ-2009-112b.pdf.

[178] See http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/2010-0407-Preliminary_Staff_Report_-
_Securitization_and_the_Mortgage_Crisis.pdf _ for the FCIC Hearing on New Century Mortgage

2004, Chief Operating Officer and later CEO Brad Morrice recommended these results be removed from the statistical tools used to track loan performance, and in 2005, the department was dissolved and its personnel terminated. The same year, the Internal Audit department identified numerous deficiencies in loan files; out of nine reviews it conducted in 2005, it gave the company's loan production department *"unsatisfactory"* ratings seven times. Patrick Flanagan, president of New Century's mortgage-originating subsidiary, cut the department's budget, saying in a memo that the *"group was out of control and tries to dictate business practices instead of audit."*

106.    On June 16, 2012, the Federal Housing Finance Agency ("FHFA") who also has filed suit against Defendant Goldman for selling it RMBS consisting of mortgages from the New Century,[179] made public a forensic review of more than one hundred loans originated by the defunct lender.  The FHFA forensic review revealed that 77% of the New Century loans were not underwritten in accordance with New Century's underwriting guidelines or otherwise breached the representations contained in the transaction documents. In particular, and by way of example, the review showed instances where there was no evidence that New Century tested the reasonableness of the borrower's stated income for the employment listed on the application as required by the applicable underwriting guidelines. In addition, the review demonstrated that the borrower, in fact, falsely inflated his or her income on the application, resulting in lower than actual debt to income ratios ("DTI"). Such misrepresentations were material to the originator's decision to lend because the DTI ratio is an important measure of the borrower's ability to repay the loan. Had the loan underwriter performed a reasonableness test as required by the applicable underwriting guidelines, the unreasonableness of the borrower's stated income would have been evident.

107.    For example:  A loan that closed in May 2006 with a principal balance of $310,250 was originated by New Century as a stated income loan and was included in the

---

[179] See http://www.fhfa.gov/webfiles/22589/FHFA%20v%20Goldman%20Sachs.pdf for *Federal Housing Finance Agency v. Goldman, Sachs & Co.*.

NCHET 2006-2 Securitization. The loan application stated that the borrower was employed as a construction worker earning $6,800 per month. The borrower's stated income exceeded the Bureau of Labor Statistic's 90th percentile salary for a construction worker in the same geographic region, which should have been a red flag to the underwriter that the income was overstated. Moreover, in the Statement of Financial Affairs filed by the borrower as part of a 2007 Chapter 13 Bankruptcy, the borrower reported total income of $17,170 for 2006, resulting in a monthly income $1,431. There was no evidence in the file that the underwriter tested the reasonableness of the stated income. A recalculation of DTI based on the borrower's verified income yielded a DTI of 212.61 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $273,719, which is over 88 percent of the original loan amount.

108.    A loan that closed in May 2006 with a principal balance of $216,000 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. The loan application stated that the borrower was self-employed as a realtor earning $14,000 per month. The borrower's stated income exceeded CBSalary.com's 90th percentile salary for a small business owner, the most analogous occupation, in the same geographic region, which should have been a red flag to the underwriter that the borrower's income was overstated. Moreover, the loan file contained post-closing loan modification documents, including the Borrower's 2006 tax return for the same employer at the time of loan origination, which reflected earnings for the borrower of $1,864 per month. There was no evidence in the file that the underwriter tested the reasonableness of the stated income. A recalculation of DTI based on all evidence uncovered by the forensic review, yielded a DTI of 364.08 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of 121,937, which is over 56 percent of the original loan amount. Similarly, the FHFA review revealed that New Century failed to incorporate all of a borrower's monthly obligations into its evaluations, precluding it from properly assessing the borrower's ability to repay the loan. The following are examples where New Century's underwriting process either failed to incorporate all of the borrower's debt or the monthly debt obligations were incorrectly

77

calculated. Properly calculated, the borrower's actual DTI ratio exceeded the limits established by New Century's guidelines. For example:

109.    A loan that closed in March 2006 with a principal balance of $442,000 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. The forensic review revealed that the underwriter improperly excluded the monthly mortgage insurance payment of $118 along with two mortgage loans with total monthly payments of $2,206, and the underwriter improperly calculated the borrower's hazard insurance and taxes. A recalculation of the DTI based on all evidence uncovered by the forensic review resulted in an increase from 49.84 percent to 215.79 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $248,501, which is over 56 percent of the original loan amount.

110.    A loan that closed in March 2006 with a principal balance of $130,500 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. The forensic review revealed that the borrower obtained a mortgage prior to the closing of the subject loan, which resulted in an additional monthly payment of $2,747.00. Although this loan was not listed on the application for the subject loan, there were eight credit inquiries listed on the origination credit report for the previous 90 days. There is no evidence in the file the underwriter investigated the credit inquiries or took the additional debt obligations into account in originating the loan. Moreover, the borrower failed to include the monthly mortgage insurance of $57 per month. A recalculation of the DTI that includes the borrower's undisclosed debt and monthly mortgage insurance resulted in an increase from 46.68 percent to 181.06 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $134,223, which is over 102 percent of the original loan amount. Relatedly, the FHFA's review showed the following examples where the borrower's credit report contained numerous credit inquiries which should have put New Century on notice for potential misrepresentations of debt obligations, and the resulting impact on the DTI ratio. Had New Century properly addressed these irregularities, the undisclosed liabilities would have been discovered.

78

Failure to investigate these issues prevented the loan underwriting process from appropriately qualifying the loan and evaluating the borrower's ability to repay the loan.

111.     For example:  A loan that closed in May 2006 with a principal balance of $156,478 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. A credit report included in the origination file dated prior to closing shows eight credit inquiries within the previous 90 days, including numerous inquiries from mortgage lenders and servicers. There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. Moreover, the borrower obtained another mortgage prior to the closing of the subject loan, which resulted in an additional monthly payment of $1,509. A recalculation of the DTI based on all evidence uncovered in the forensic review resulted in an increase in DTI from 48.25 percent to 76.77 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $1,815.

112.     A loan that closed in May 2006 with a principal balance of $100,251 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. A credit report included in the origination file dated prior to closing shows nine credit inquiries within the previous 90 days, including numerous inquiries from mortgage lenders and servicers. There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. Moreover, the borrower obtained another mortgage prior to the closing of the subject loan, which resulted in an additional monthly payment of $1,688. The additional mortgage was not listed on the application for the subject loan. A recalculation of the DTI based on all evidence uncovered in the forensic review resulted in an increase from 38.93 percent to 80.17 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $74,295, which is over 74 percent of the original loan amount.

113.     Hence, despite qualifying and better suited for a fixed rate mortgage, the broker-agent of New Century Mortgage aggressively pushed upon the late Thomas Roger and the complainant a subprime ARM in November 2006 for their was a greater financial incentive for the Defendant to originate ARM's rather than fixed rate mortgages when originating loans to be sold to Goldman for pooling and securitization (often lack thereof) into RMBS. In addition, this subprime ARM refinance contributed to an appraised value of $190,800, resulting in a 226% increase in the appraised value relative to the $84,343 purchase price when the Rogers first brought the property in November 1999. The 226% increase in the appraised value is extremely higher than the national average of 50%[180] over the same time frame, and brings into question the fraudulent appraisal practices[181] of New Century that have now become well documented along with their predatory lending behavior identified in 2004 by the lender's Quality Assurance department, but ignored and negligently continued by CEO Brad A. Morrice[182].

114.     Consequently, with the February 1, 2007 pooling and servicing Agreement,[183] New Century (unknowingly to the complainant and the late Thomas Rogers) and Goldman (reportedly) pooled and securitized the Rogers' mortgage together with 9,799 others, totaling $1,914,019,077 of mortgage loans into a RMBS they named GSAMP TRUST 2007 – NC1[184], creating approximately $1,733,851,200 of mortgaged backed

---

[180] See http://www.ncpa.org/pdfs/st335.pdf for the National Center for Policy Analysis' June 2011 report "*The Housing Crash and Smart Growth*"(Page 4).

[181] See Written Testimony of Patricia Lindsay, former Vice President of Corporate Risk at New Century, before the FCIC Hearing, April 7, 2010, http://fcic-static.law.stanford.edu/cdn-media/fcic.testimony/2010-0407-Lindsay.pdf, at 3.

[182] See http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/2010-0407-Preliminary_Staff_Report_-_Securitization_and_the_Mortgage_Crisis.pdf for the FCIC report detailing a June 2004 presentation by New Century's Quality Assurance staff reporting that they had found severe underwriting errors, including evidence of predatory lending, federal and state violations, and credit issues, in 25% of the loans they audited in November and December 2003. As a result, in 2004, Chief Operating Officer and later CEO Brad Morrice recommended these results be removed from the statistical tools used to track loan performance, and in 2005, the department was dissolved and its personnel terminated.

[183] See http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf and http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf for more information about the Pooling and Servicing Agreement of February 1, 2007 that created GSAMP TRUST 2007 – NC1

[184] See http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf for more information about GSAMP TRUST 2007 – NC1

inefficiencies and fraud,[190] including the element of fraudulent practices such as those of New Century which were acknowledged by the U.S. Attorney's office in February 2007,[191] and further substantiated by investigations, lawsuits, and the firms insolvency by April 2007.

116.     Thus, the documented events that transpired between November 28, 2006 - April 2007 includes...

- November 28, 2006, New Century, presenting itself as a financially solvent mortgage originator, refinanced the late Thomas Rogers, husband of the complainant Frances Rogers, into an Adjustable Rate Mortgage with a 7.05% interest rate, loan balance of $190,800[192].

- February 1, 2007, New Century enters into a mortgage Pooling and Servicing Agreement with several entities, including Goldman via its subsidiaries GS Mortgage Securities, Corp. (depositor) / and Avelo Mortgage, L.L.C. (servicer who in August 2008 was integrated into Litton, a subsidiary of Goldman purchased in Dec. 2007), Goldman Sachs Mortgage Company (sponsor), BOA (trustee as successor by merger to LaSalle Bank National Association as of Oct. 2007), Wells Fargo Bank, N.A. (master servicer and securities administrator), Deutsche Bank National Trust Company (custodian), and MERS (nominee), creating GSAMP TRUST 2007 – NC1, $1,733,851,200 worth of mortgaged backed securities, originated by New Century, impacting

---

[190] See Testimony of Patricia Lindsay, former Vice President of Corporate Risk at New Century, before the FCIC Hearing, April 7, 2010, http://fcic-static.law.stanford.edu/cdn-media/fcic.testimony/2010-0407-Lindsay.pdf, at 3, documenting fraudulent practices of New Century as early as 2004, 2 years prior to the firms origination of the subprime ARM refinance for the Rogers.

[191] See http://money.cnn.com/2007/03/13/news/companies/new_century/index.htm for New Century Financial Corporation's subpoena.

[192] See **EXHIBITS – 2H, 2I, & 2J** for a Comparative Market Analysis of Willingboro, New Jersey from 2002 to December 2012.

9,800 residential mortgages across the United States of America, including Thomas and Frances Rogers.[193]

- February 28, 2007, the U.S. Attorney's office indicated in a letter that it was conducting a criminal inquiry in connection with trading in New Century's securities as well as accounting errors regarding the company's allowance for repurchase losses. The filing further stated that the Securities and Exchange Commission has requested a meeting with the company to discuss the company's previous announcement that it would restate certain financial statement.[194]

- March 9, 2007, New Century reported that it had failed to meet certain minimum financial targets required by its warehouse lenders and disclosed that it is the subject of a federal criminal investigation. New Century further indicated that it does not have the cash to pay creditors who are demanding their money.

- March 12, 2007, the New York Stock Exchange said in a statement it halted trading of New Century while it decides whether to keep listing the company's securities in light of the liquidity problems.

- March 13, 2007 New Century was delisted from the New York Stock Exchange.[195]

---

[193]See http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf and http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf for more information about the Pooling and Servicing Agreement of February 1, 2007 that created GSAMP TRUST 2007 – NC1

[194] See http://money.cnn.com/2007/03/13/news/companies/new_century/index.htm for New Century Financial Corporation's subpoena.

[195] See http://www.nyse.com/press/2_2007.html for the NYSE halting of trading and removal of New Century Financial Corporation.

- March 14, 2007, in a filing with the Securities and Exchange Commission, New Century said that Fannie Mae terminated "for cause" a mortgage selling and servicing contract with it citing alleged breaches of that contract and others, resulting in a notice of breach and termination.

- March 20, 2007, New Century said that it can no longer sell mortgage loans to Fannie Mae or act as the primary servicer of mortgage loans for the government sponsored enterprise. In a filing with the Securities and Exchange Commission, New Century said that Fannie Mae terminated "for cause" a mortgage selling and servicing contract with it citing alleged breaches of that contract and others. New Century said it received a notice of breach and termination on March 14, 2007.

- March 26, 2008, an unsealed report by bankruptcy court examiner Michael J. Missal on, outlined a number of *"significant improper and imprudent practices related to its (New Century Mortgage) loan originations, operations, accounting and financial reporting processes...*[196]

117.    Hence the aforementioned events that transpired weeks after the refinance of the late Thomas Rogers, spouse of the complainant, along with 2010's lawsuit against Defendant Brad A. Morrice, *Securities and Exchange Commission v. Brad A. Morrice et al., Civil Action No. CV 09-01426 DDP (C.D. Cal.)*[197], and subsequent lawsuits against Goldman, the creator of the RMBS consisting of New Century loans (See *Public Employees Retirement System of Mississippi v. Goldman Sachs Group Inc., 09-cv-01110, U.S. District Court, Southern District of New York Manhattan*[198], *Federal Housing*

---

[196] See http://www.ft.com/cms/s/0/df6f0bae-fbb3-11dc-8c3e-000077b07658.html#axzz2DUqCwu5x for report by bankruptcy court examiner regarding New Century Financial Corporation's troublesome financial state.

[197] See http://www.sec.gov/litigation/complaints/2009/comp21327.pdf for *Securities and Exchange Commission v. Brad A. Morrice et al., Civil Action No. CV 09-01426 DDP (C.D. Cal.)*, settled in July 2010.

[198] See http://sdnyblog.com/wp-content/uploads/2012/06/09cv01110-Order.pdf for *Public Employees Retirement System of Mississippi v. Goldman Sachs Group Inc., 09-cv-01110, U.S. District Court, Southern District of New York Manhattan*, settled in July 2012.

_Finance Agency v. Goldman, Sachs & Co.,_[199], _Prudential v. Goldman Sachs,_[200] and _FDIC v. Goldman_[201]), are several of many lawsuits in which the Plaintiff's major contention is the fraudulent practices of New Century and other loan originators.   Thus, the aforementioned lawsuits settled and pending, sanctions, investigations, and the facts presented by the complainant substantiate a deliberate _pattern of Racketeering and Fraud_ by New Century and its CEO and co-founder, Defendant Brad A. Morrice.   New Century's refinance of the late Thomas Rogers, spouse of the complainant, on November 28, 2006 should have not taken place[202] for the company was actually insolvent prior to being declared so in March 2007.   In addition, the late Thomas Rogers qualified for a fixed rate loan but instead was manipulated into an ARM due to the Defendant's greater financial incentive to originate ARM's to be sold to Wall Street firms such as Goldman for the creation of RMBS.   The complainant's loan, however, was not transferred into GSAMP Trust 2007 – NC1 as evident within **EXHIBIT – 2C**, and as declared by the Defendants in the prospectus.[203]

**118.**    Thus, New Century's reckless subprime loan originations, underlined by fraudulent appraisals and predatory lending, followed by the pooling and servicing

---

[199] See http://www.fhfa.gov/webfiles/22589/FHFA%20v%20Goldman%20Sachs.pdf for _Federal Housing Finance Agency v. Goldman, Sachs & Co.,_

[200] See http://reaction.orrick.com/rs/emsdocuments/FinancialIndustryWeekInReview/17September2012/C.pdf for Prudential v. Goldman, New Jersey lawsuit from 2012.

[201] See http://www.housingwire.com/news/fdic-sues-multiple-banks-over-sale-rmbs-failed-bank for FDIC v. Goldman

[202] As declared in _Barnsdall Refining Corn. V. Birnam Wood Oil Co. 92 F 26 817_, the courts ruled that _"any false representation of material facts made with knowledge of falsity and with intent that it shall be acted on by another in entering into contract, and which is so acted upon, constitutes 'fraud,' and entitles party deceived to avoid contract or recover damages."_ Furthermore, in _Whipp v. Iverson, 43 Wis 2d 166_, the court declared _"It is not necessary for recision of a contract that the party making the misrepresentation should have known that it was false, but recovery is allowed even though misrepresentation is innocently made, because it would be unjust to allow one who made false representations, even innocently, to retain the fruits of a bargain induced by such representations."_ Furthermore is the ruling in _Menominee River Co. v. Augustus Spies L & C Co., 147 Wis 559. 572; 132 NW 1122_, declaring… _"If any part of the consideration for a promise be illegal, or if there are several considerations for an unserverable promise one of which is illegal, the promise, whether written or oral, is holly void, as it is impossible to say what part or which one of the considerations induce the promise."_

[203] See http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf for more information about the Pooling and Servicing Agreement of February 1, 2007 that created GSAMP TRUST 2007 – NC1

agreement of February 1, 2007[204], all introduced Thomas Rogers and the complainant to Goldman, its mortgage servicer Litton, MERS, Wells Fargo Bank, N.A., Deutsche Bank National Trust Company, BOA, PHS, and Ocwen, thus, subjecting the Rogers to a deliberate, fraudulent, and negligent foreclosure scheme, to which inflicted undeserved stress to the cancer stricken, diabetic, heart surgery patient Thomas Rogers. Thus, the unjust stress resulting from the collusion of the Defendants operating a fraudulent mortgage related scheme that contributed to the demise of Thomas Rogers in June 2009, and the ongoing emotional, mental, physical, and financial distress of his surviving spouse, the complainant Frances Rogers. In addition, the complainant contends that the foreclosure efforts of Litton as the servicer of GSAMP Trust 2007 – NC1 (Litton was owned by Goldman from Dec. 2007 to Sept. 2011), MERS as the nominee, Wells Fargo Bank, N.A. as the master servicer and securities administrator, Deutsche Bank National Trust Company as the custodian, BOA as trustee, NC Capital Corporation (parent company of New Century and the responsible party to GSAMP Trust 2007 – NC1), and Phelan Hallinan & Schmieg, PC as legal counsel executing the foreclosure for GSAMP Trust 2007 – NC1 throughout 2009 – 2010, were perpetuated by fraud, extortion, negligence, aiding, and abetting for the aforementioned trust lacked the complainant's note documented in **EXHIBITS – 2C & 2D**, resulting in a fraudulent assignment, and an unwarranted foreclosure pursuit by the Defendants.

119.     Thus, CEO Brad A. Morrice continued *"Close More University"* originating and pushing ARM's upon unsophisticated homeowners such as the late Thomas Rogers and his wife, despite complete knowledge of New Century's financial troubles, fraudulent practices, and declared insolvency in April 2007.[205]  Instead of promoting fixed rate mortgages which were better suited for homeowners such as the late Thomas Rogers and his spouse, New Century pushed ARM's to homeowner's (despite their ability to pay the loans upon the rate adjustment) because there was a greater financial incentive to

---

[204] See http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf for more information about the Pooling and Servicing Agreement of February 1, 2007 that created GSAMP TRUST 2007 – NC1

[205] See http://money.cnn.com/2007/04/02/news/companies/new_century_bankruptcy/ for New Century Financial Corporation's bankruptcy and insolvency as of April 2007.

originate ARM's over fixed rate mortgages, loans that were later sold and pooled by the creators of RMBS and funders of New Century, including Goldman Sachs. This allegation is further substantiated by findings within a report by the FCIC detailing a June 2004 presentation by New Century's Quality Assurance staff reporting that they had found severe underwriting errors, including evidence of predatory lending, federal and state violations, and credit issues, in 25% of the loans they audited in November and December 2003. As a result, in 2004, Chief Operating Officer and later CEO Brad Morrice, Defendant to this complaint, recommended these results be removed from the statistical tools used to track loan performance, and in 2005, the department was dissolved and its personnel terminated.[206]

120.    Hence, the aforementioned allegations made by the complainant in the foregoing paragraphs and discovered by U.S. Authorities and lawsuits against the Defendant Brad A. Morrice as the CEO of New Century Mortgage, demonstrates the Defendant's collusion and complete participation in a *Racketeering and Fraud* scheme with Goldman (the often financier of loans originated by the Defendant's defunct company, through a "warehouse" line of credit) and the other parties of GSAMP Trust 2007 – NC1. Thus, the Defendant's gross negligence that is evident in the fraudulent appraisals of New Century, the disregard for predatory lending practices identified by the firms' Quality Assurance Department in 2004, the fraudulent concealment of the companies impending insolvency, the aiding, and abetting his co-conspirators Goldman Sachs desire for more subprime mortgages to feed their CDO machine despite the inherent issues of loans from New Century, introduced the Rogers to a sinister platform that continued on after the collapse of New Century through GSAMP Trust 2007 – NC1, Litton, MERS, Goldman, Wells Fargo Bank, N.A., Deutsche Bank National Company Trust, PHS, and BOA, thus, contributing to the death of Thomas Rogers in 2009 and the complainant's continued emotional, mental, physical, and financial distress that has yet to be corrected.

---

[206] See http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/2010-0407-Preliminary_Staff_Report_-_Securitization_and_the_Mortgage_Crisis.pdf for the FCIC report detailing a June 2004 presentation by New Century's Quality Assurance staff.

## C. GSAMP Trust 2007 – NC1:  "Asset(less) Backed Security"

**121.**        On February 1, 2007, Goldman Sachs created another RMBS, (reportedly) pooling and servicing together 9,800 mortgages originated by the defunct New Century Mortgage, of which included the November 28, 2006 ARM of the Rogers.  The following is a list of the relevant parties to GSAMP Trust 2007 – NC1 who are Defendants to this complaint, along with a brief description of their duties per the prospectus.

**122.**        **THE SPONSOR:  Goldman Sachs Mortgage Company.**  Per the prospectus for GSAMP Trust 2007 – NC1:[207]

"The sponsor is Goldman Sachs Mortgage Company, a New York limited partnership ("GSMC").  GSMC is the parent of depositor and an affiliate, through common parent ownership, of the underwriter, the swap provider, the cap provider and Avelo.  GSMC was formed in 1984.  Its general partner is Goldman Sachs Real Estate Funding Corp. and its limited partner is The Goldman Sachs Group, Inc.   GSMC purchases closed, independently funded, first and subordinate lien residential mortgage loans for its own investment, securitization or resale.   In addition, GSMC provides warehouse and repurchase financing to mortgage lenders.  GSMC does not service loans.  Instead GSMC contracts with another entity to service the loans on its behalf.  GSMC also may engage in the secondary market activities noted above for non-real estate-secured loans in certain jurisdictions and other activities, but its principal business activity involves real estate-secured assts.

GSMC has been active as a sponsor in the securitization market since 2001.  As a sponsor, GSMC acquires residential mortgage loans in the secondary mortgage market and initiates the securitization of the loans it acquires by transferring the

---

[207] See the prospectus for GSAMP Trust 2007 – NC1 at
http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-54, for the
responsibilities of the "Sponsor" and "Master Servicer."

loans to the depositor, which loans will ultimately be transferred to the issuing entity for the related securitization. As of December 31, 2006, GSMC has sponsored the securitization of approximately $162 billion of residential mortgage loans, which include prime, subprime, Alt-A, FHA/VA/RHS, second lien, home equity lines of credit, "scratch and dent," re-performing and seasonal loans, among others... Prior to acquiring any residential mortgage loans, GSMC will conduct a review of the related mortgage loan seller. GSMC's review process consists of reviewing select financial information for credit and risk assessment and underwriting guideline review, senior level management discussion and backgrounds checks. The scope of the mortgage loan due diligence will depend on the credit quality of the mortgage loans. The underwriting guideline review considers mortgage loan origination processes and systems. In addition, such review considers corporate policy and procedures relating to state and federal predatory lending and high cost lending laws, origination practices by jurisdiction, historical loan level loss experience, quality control practices, significant litigation and material investors. Servicers are assessed based upon review of systems and reporting capabilities (as compared against industry standard), review of collection procedures and confirmation of servicers' ability to provide loan-level data. In addition, GSMC conducts background checks, meets with senior management to determine whether the servicer complies with industry standards and otherwise monitors the servicer on an ongoing basis. GSMC has been the sponsor of securitizations backed by subprime mortgage loans since 2002."

123.     **THE DEPOSITOR: GS Mortgage Securities Corp.** Per the prospectus for GSAMP Trust 2007 – NC1:[208]

"The depositor is GS Mortgage Securities Corp., a Delaware corporation. The depositor is a wholly-owned subsidiary of the sponsor, GSMC, and is an affiliate,

---

[208] See the prospectus for GSAMP Trust 2007 – NC1 at
http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-56, for the responsibilities of the "Issuing Entity", "Depositor", and "Securities Administrator."

through common parent ownership, of the underwriter, the swap provider, the cap provider and Avelo. The depositor will not have any business operations other than securitizing mortgage assets and related activities. The certificate of incorporation of the depositor limits its activities to those necessary or convenient to carry out its securitization activities. The depositor will have limited obligations with respect to a series of securities. The depositor will obtain the mortgage loans from the sponsor, and may also assign to the trustee certain rights of the sponsor with respect to the mortgage loans.... In addition, after the issuance of the certificates, the depositor will have certain limited obligations, which includes, without limitation, appointing a successor trustee if the trustee resigns or is otherwise removed and preparing, or causing to be prepared, certain reports filed under the Securities Exchange Act of 1934, as amended."

124.     **THE ISSUING ENTITY:  GSMAP Trust 2007 – NC1.**  Per the prospectus for GSAMP Trust 2007 – NC1: [209]

"GSAMP Trust 2007-NC1, the issuing entity, will be formed on the closing date pursuant to the pooling and servicing agreement. The issuing entity will be a New York common law trust with no officers or directors and no continuing duties other than to hold and service the mortgage loans and related assets and issue the certificates..."

125.     **THE TRUSTEE:  Bank of America, N.A. as successor by merger to LaSalle Bank National Association (October 2007).**  Per the prospectus for GSAMP Trust 2007 – NC1:[210]

---

[209] See the prospectus for GSAMP Trust 2007 – NC1 at http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-56, for the responsibilities of the "Issuing Entity", "Depositor", and "Securities Administrator."

[210] See the prospectus for GSAMP Trust 2007 – NC1 at http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-57, for the responsibilities of the "Trustee" and "Custodian."

"LaSalle Bank National Association will be the trustee under the pooling and servicing agreement. LaSalle Bank National Association is a national banking association formed under the federal laws of the United States of America. Since January 1994, LaSalle has served as trustee, securities administrator or paying agent on over 500 residential mortgage-backed security transactions involving assets similar to the mortgage loans. As of December 31, 2006, LaSalle serves as trustee, securities administrator or paying agent over 425 residential mortgage-backed security transactions. The depositor, the servicer and other parties to the transaction may maintain other banking relationships in the ordinary course of business with the trustee.

126.    **THE MASTER SERVICER:  Wells Fargo Bank, N.A.**  Per the prospectus for GSAMP Trust 2007 – NC1: [211]

"Wells Fargo Bank, N.A. will act as the master servicer for the mortgage loans pursuant to the terms of the pooling and servicing agreement. The master servicer is responsible for the aggregation of monthly servicer reports and remittances and for oversight of the performance of the servicer under terms of the pooling and servicing agreement. In particular, the master servicer independently calculates monthly loan balances based on servicer data, compares its results to servicer loan-level reports and reconciles any discrepancies with the servicer. The master servicer also reviews the servicing of defaulted loans for compliance with the terms of the pooling and servicing agreement. In addition, upon the occurrence of certain servicer events of default under the terms of the pooling and servicing agreement, the master servicer may be required to enforce certain remedies on behalf of the issuing entity against such defaulting servicer. As of December 31, 2006, Wells Fargo Bank was acting as master servicer for approximately 1,427

---

[211] See the prospectus for GSAMP Trust 2007 – NC1 at
http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-54, for the responsibilities of the "Sponsor" and "Master Servicer."

series of residential mortgage-backed securities with an aggregate outstanding principal balance of approximately $748 billion."

127.     **THE CUSTODIAN: Deutsche Bank National Trust Company.**  Per the prospectus GSAMP Trust 2007 – NC1:[212]

> "The custodian will act as a custodian of the applicable mortgage loan files pursuant to the pooling and servicing agreement.  The custodian will be responsible to hold and safeguard the applicable mortgage notes and other contents of the applicable mortgage files on behalf of the certificate holders.  The custodian segregates the applicable mortgage files for which it acts as custodian by boarding each applicable mortgage file in an electronic tracking system, which identifies the owner of the mortgage file and the mortgage files specific location in the custodian's vault…"

128.     **THE SERVICER: New Century Mortgage Corporation, Avelo Mortgage, L.L.C. (a Goldman Sachs subsidiary), Litton Loan Servicing, LP (a Goldman Sachs subsidiary).**  Per the prospectus for GSAMP Trust 2007 – NC1:[213]

> "Avelo Mortgage, L.L.C. will act as servicer of the mortgage loans, except for the period beginning on the closing date and ending on a servicing transfer date scheduled to occur by May 2007 during which period New Century Mortgage Corporation, an affiliate of the responsible party, will service the mortgage loans. The servicer will be obligated to service and administer the mortgage loans on behalf of the issuing entity, for the benefit of the holders of the certificates…"

---

[212] See the prospectus for GSAMP Trust 2007 – NC1 at http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-57, for the responsibilities of the "Trustee" and "Custodian."

[213] See the prospectus for GSAMP Trust 2007 – NC1 at http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-7, S-13, and S-50, for the responsibilities of the "Servicer."

**129.      THE SECURITIES ADMINISTRATOR:  Wells Fargo Bank, N.A.**  Per the
prospectus for GSAMP Trust 2007 – NC1: [214]

> "Wells Fargo will act as securities administrator under pooling and servicing
> agreement…  Under the terms of the pooling and servicing agreement, Wells
> Fargo is responsible for securities administration, which includes pool
> performance calculations, distribution calculations and the preparation of monthly
> distribution reports.  As securities administrator, Wells Fargo is responsible for
> the preparation of monthly distribution reports.  As securities administrator, Wells
> Fargo is responsible for the preparation and filing of all REMIC tax returns on
> behalf of the Trust REMICs and the preparation of monthly reports on Form 10-
> D, annual reports on Form 10-K and current reports on Form 8-K that are required
> to be filed with the Securities and Exchange Commission on behalf of the issuing
> entity.  Wells Fargo has been engaged in the business of securities administration
> since June 30, 1995.  As of December 31, 2006, Wells Fargo was acting as
> securities administrator with respect to more than $1 trillion of outstanding
> residential mortgage - backed securities."

**130.      SERVICING, MASTER SERVICING, SECURITIES ADMINSTRATOR,
TRUSTEE AND CUSTODIAN FEES:**  Per the prospectus for GSAMP Trust 2007 –
NC1: [215]

> "The servicer is entitled with respect to each mortgage loan serviced by it to a
> monthly servicing fee, which will be retained by the servicer from amounts on
> deposit in the collection account.  The servicing fee for the servicer will be an
> amount equal to interest at one twelfth of a rate equal to 0.50% on the stated
> principal balance of each mortgage loan serviced by the servicer…

---

[214] See the prospectus for GSAMP Trust 2007 – NC1 at
http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-56, for the
responsibilities of the "Issuing Entity", "Depositor", and "Securities Administrator."

[215] See the prospectus for GSAMP Trust 2007 – NC1 at
http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-14, for the Servicing,
Master Servicing, Securities Administrator, Trustee, and Custodian Fees.

The master servicer is entitled with respect to each mortgage loan to a monthly master servicer fee, which will be remitted to the master servicer monthly by the servicer from amounts on deposit in the collection account.  The master servicer fee will be an amount equal to one-twelfth of a rate not greater than 0.01% on the stated principal balance of each mortgage loan.  The securities administrator will be entitled to retain any net interest or other income earned on deposits in the distribution account, and the securities administrator will pay the trustee and the custodian fee, as applicable, from the securities administrator's own funds."

131.    In addition, per the prospectus for GSAMP Trust 2007 – NC1 created by the Pooling and Servicing Agreement dated February 1, 2007, regarding the Mortgage Loan Pool[216] (S-36), Assignment of the Mortgage Loans, Delivery of Mortgage Loan Documents, and Delivery of Mortgage Loan Documents[217] (S-63), and MERS Designated Mortgage Loan[218] (Page 91):

"The statistical information presented in this prospectus supplement concerning the mortgage loans is based on the scheduled principal balances of the mortgage loans as of the statistical calculation date, which is January 1, 2007. The mortgage loan principal balances that are transferred to the issuing entity will be the scheduled principal balances as of the cut-off date, February 1, 2007…

Pursuant to a mortgage loan purchase and warranties agreement (the "Sale Agreement"), *the responsible party*[219] sold the mortgage loans, without recourse,

[216] See http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-36, the prospectus for GSAMP Trust 2007 – NC1, cut of date February 1, 2007.

[217] See http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-63, the prospectus for GSAMP Trust 2007 – NC1, cut of date February 1, 2007.

[218] See http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf , Page 91, the designation of MERS as nominee for GSAMP Trust 2007 – NC1, cut of date February 1, 2007.

[219] See http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf , for the designation of NC Capital Corporation, owner of New Century Mortgage, the "Responsible Party" for GSAMP Trust 2007 – NC1, cut of date February 1, 2007.  On February 28, 2007, New Century Mortgage was subpoena by the U.S. Attorney General and

to GSMC.   GSMC[220] will sell and convey the mortgage loans, including all principal outstanding as of, and interest due and accruing after, the close of business on the cut-off date, without recourse, to the depositor on the closing date. Pursuant to the pooling and servicing agreement, the depositor will sell, without recourse, to the issuing entity, all right, title and interest in and to each mortgage loan, including all principal outstanding as of, and interest due after, the close of business on the cut-off date. Each such transfer will convey all right, title and interest in and to (a) principal outstanding as of the close of business on the cut-off date (after giving effect to payments of principal due on that date, whether or not received) and (b) interest due and accrued on each such mortgage loan after the cut-off date.   However, GSMC will not convey to the depositor, and will retain all of its right, title and interest in and to (x) principal due on each mortgage loan on or prior to the cut-off date and principal prepayments in full and curtailments (i.e., partial prepayments) received on each such mortgage loan on or prior to the cut-off date and (y) interest due and accrued on each mortgage loan on or prior to the cut-off date.   In connection with the sale, transfer and assignment of each mortgage loan to the issuing entity, the depositor will cause to be delivered to the custodian, on or before the closing date, the following documents with respect to each mortgage loan, which documents constitute the mortgage file: (a) the original mortgage note, endorsed without recourse in blank by the last endorsee, including all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee (except for no more than 1.00% of the mortgage loans for which there is a lost note affidavit and a copy of the mortgage note); (b) the original of any guaranty executed in connection with the mortgage note; (c) the related original mortgage and evidence of its recording or, in certain limited circumstances, a copy of the mortgage certified by the

---

wanted for questioning by the SEC for its fraudulent mortgage related practices, see http://money.cnn.com/2007/03/13/news/companies/new_century/index.htm for New Century Financial Corporation's subpoena.

[220] See http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf, for the designation of Goldman subsidiary GSMC as the *"Sponsor"* for GSAMP Trust 2007 – NC1, cut of date February 1, 2007.

originator, escrow company, title company, or closing attorney; (d) the originals of any intervening mortgage assignment(s), showing a complete chain of assignment from the originator of the related mortgage loan to the last endorsee or, in certain limited circumstances, (i) a copy of the intervening mortgage assignment together with an officer's certificate of the responsible party (or certified by the title company, escrow agent or closing attorney) stating that of such intervening mortgage assignment has been dispatched for recordation and the original intervening mortgage assignment or a copy of such intervening mortgage assignment certified by the appropriate public recording office will be promptly delivered upon receipt by responsible party, or (ii) a copy of the intervening mortgage assignment certified by the appropriate public recording office to be a true and complete copy of the recorded original; (e) the original mortgage assignment in recordable form, which, if acceptable for recording in the relevant jurisdiction, may be included in a blanket assignment or assignments, of each mortgage from the last endorsee in blank; (f) originals of all assumption, modification, consolidation and extension agreements, if provided, in those instances where the terms or provisions of a mortgage or mortgage note have been modified or such mortgage or mortgage note has been assumed; (g) an original title insurance policy (or a copy); and (h) the original of any security agreement, chattel mortgage or equivalent document executed in connection with the mortgage (if provided). Pursuant to the pooling and servicing agreement, the custodian will agree to execute and deliver on or prior to the closing date an acknowledgment of receipt of the original mortgage note, item (a) above, with respect to the applicable mortgage loans, with any exceptions noted. The *custodian* [221] will agree, for the benefit of the holders of the certificates, to review, or cause to be reviewed, each mortgage file required to be held by it within ninety days after the closing date – or, with respect to any Substitute Mortgage Loan delivered to the custodian or the trustee, within thirty days after the receipt of the

---

[221] See http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf , for the designation of Deutsche Bank as the *"Custodian"* for GSAMP Trust 2007 – NC1, cut of date February 1, 2007.

mortgage file by the custodian, – and to deliver a certification generally to the effect that, as to each mortgage loan listed in the schedule of mortgage loans:

- all documents required to be reviewed by it pursuant to the pooling and servicing agreement are in its possession;
- each such document has been reviewed by it and appears regular on its face and relates to such mortgage loan;
- based on its examination and only as to the foregoing documents, certain information set forth on the schedule of mortgage loans accurately reflects the information set forth in the mortgage file delivered on such date; and
- each mortgage note has been endorsed as provided in the pooling and servicing agreement.

If the custodian during the process of reviewing the mortgage files, finds any document constituting a part of a mortgage file that is not executed, has not been received or is unrelated to the mortgage loans, or that any mortgage loan does not conform to the requirements above or to the description of the requirements as set forth in the schedule of mortgage loans, the custodian is required to promptly so notify the responsible party, the servicer, the trustee and the depositor in writing.[222]   The responsible party will be required to use reasonable efforts to cause to be remedied a material defect in a document constituting part of a mortgage file of which it is so notified by the custodian. If, however, within 30 days after the earlier of either discovery by or notice to the responsible party of such defect, the responsible party has not caused the defect to be remedied, the responsible party will be required to either (a) substitute a Substitute Mortgage Loan for the defective mortgage loan, or (b) repurchase the defective mortgage loan.  The substitution or repurchase is required to be effected in the same manner

---

[222] See **EXHIBITS - 2C & 2D** along with  http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , the prospectus for GSAMP Trust 2007 – NC1, cut of date February 1, 2007, demonstrating that New Century nor MERS as the nominee didn't transfer the complainant's property per the prospectus until a fraudulent assignment executed by a PHS employee which was recorded by the Burlington County Clerk in July 2009.

as a substitution or repurchase for a material breach of a mortgage loan representation and warranty, as described below under "—Representations and Warranties Relating to the Mortgage Loans". The obligations of the responsible party to cure such breach or to purchase any mortgage loan and to indemnify for such breach constitute the sole remedies respecting a material breach of any such representation or warranty available to the holders of the certificates, the depositor, the servicer, the custodian and the trustee...

Mortgage Loans for which the Responsible Party has designated or will designate MERS[223] as, and has taken or will take such action as is necessary to cause MERS to be, the mortgagee of record, as nominee for the Responsible Party, in accordance with the MERS Procedures Manual and (b) the Responsible Party has designated or will designate the Trust as the Investor on the MERS(R) System."

**132.**      Contrary to the prospectus for GSAMP Trust 2007 – NC1, with a February 1, 2007 cut-off date [224] for transferring the 9,800 loans originated by New Century to the trust, neither the *"Responsible Party"*[225] NC Capital Corporation (parent company of the defunct originator), GS Mortgage Securities Corp., acting as the *"Depositor"*, or Deutsche Bank National Trust Company as the *"Custodian"*, transferred the complainant's property to the trust as they claimed in the prospectus **(SEE EXHIBITS – 2C & 2D)**.  Furthermore, per the prospectus for GSAMP Trust 2007 – NC1, Deutsche Bank National Trust Company as the *"Custodian,"* *"will be responsible to hold and safeguard the applicable mortgage notes and other contents of the applicable mortgage files on behalf of the certificate holders.  The custodian segregates the applicable mortgage files for which it acts as custodian by boarding each applicable mortgage file*

---

[223] See **EXHIBITS – 2C & 2D**, along with  http://theforeclosurefraud.com/uploads/FedCase3.ExhibitAA.PSA.pdf , Page 91, the designation of MERS as nominee for GSAMP Trust 2007 – NC1, cut of date February 1, 2007.

[224] See http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-63, the prospectus for GSAMP Trust 2007 – NC1, cut of date February 1, 2007.

[225] Six days after the creation of GSAMP Trust – NC1 on February 1, 2007, consisting of 9,800 New Century mortgages including the complainant's, the defunct originator announced it would be restating their 2006 earnings, unveiling the firms fraudulent undertaking s in 2006 and prior, all of which was later exposed.

*in an electronic tracking system, which identifies the owner of the mortgage file and the mortgage files specific location in the custodian's vault."*[226]  Thus, the custodian of GSAMP Trust 2007 – NC1 falsely reported the location of the complainant's note as secured within the trust upon the February 1, 2007 cut-off date within the prospectus, when in fact, the complainant's note was fraudulently assigned to the trust on June 19, 2009 **(SEE EXHIBITS – 2C & 2D)**.

133.        Thus, on June 19, 2009, Judith T. Romano[227], an employee of Phelan Hallinan & Schmieg, PC, signing as the *"Assistant Secretary and Vice President"* of MERS, executed a fraudulent assignment of the complainant's property to GSAMP Trust 2007 – NC1, twenty eight months after the Defendant's declared all of the 9,800 mortgages pooled were transferred by the February 1, 2007 cut-off date.  In addition, although fraudulent, the aforementioned assignment was not received by the Burlington County Clerk's office until July 29, 2009 **(SEE EXHIBIT – 2D)**.  Shortly thereafter, on June 30, 2009, the same day Thomas Rogers died, attorneys Rosemarie Diamond and Vladimir Palma of Phelan Hallinan & Schmieg, PC, on behalf of Bank of America, N.A. as the trustee of GSAMP Trust 2007 – NC1, filed a fraudulent Foreclosure Complaint with the Clerk of the Superior Court of New Jersey.  Hence, the fraudulent assignment of the complainant's property to the trust by an employee of Phelan Hallinan & Schmieg, PC signing as the *"Assistant Secretary and Vice President"* of MERS was dated June 19, 2009, and not filed with the Burlington County Clerk's office until July 29, 2009 **(SEE EXHIBIT – 2D)**, thirty days after the trust filed its foreclosure complainant dated June 30, 2009 **(SEE EXHIBIT – 2E)**, the same day Thomas Rogers died.

---

[226] See the prospectus for GSAMP Trust 2007 – NC1 at
http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf , S-57, for the responsibilities of the "Trustee" and "Custodian."

[227] See http://www.lsnj.org/NewsAnnouncements/Foreclosure/materials/LSNJReport.pdf for *"Legal Services of New Jersey Report and Recommendation to the New Jersey Supreme Court Concerning False Statements And Swearing In Foreclosure Proceedings November 4, 2010."*  As a result of the non-assignment of the complainant's NJ property to GSAMP Trust 2007 – NC1 by the February 1, 2007 cut-off per the prospectus seen at http://www.fanniemae.com/mbs/pdf/UDD_2007_114/GSAMP_2007-NC1_prospectus.pdf (S-63), Judith T. Romano, an employee of Phelan Hallinan & Schmieg, PC executed a fraudulent assignment to the trust dated June 19, 2007, signing as the "Assistant Secretary and Vice President" of MERS, as seen in **EXHIBIT – 2D**.